STATE, Respondent, *v.* YEGEN, Appellant.

(No. 6,550.)

(Submitted November 14, 1929.  Decided December 27, 1929.)

[283 Pac. 210.]

*Messrs. Arnot & Doyle* and *Mr. W. R. McDonald,* for Appellant, submitted a brief; *Mr. D. W. Doyle* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, *Mr. S. J. Rigney,* County Attorney of Glacier County, and *Mr. John W. Coburn,* for the State, submitted a brief; *Mr. S. R. Foot, Mr. Rigney* and *Mr. Coburn* argued the cause orally.

MR. JUSTICE FORD delivered the opinion of the court.

This is an appeal by defendant from a judgment of conviction on the charge of grand larceny and from an order denying his motion for a new trial.

By information the defendant was charged with having stolen a Belgian stallion branded ꓱ on the left thigh, the property of Frye & Co., a corporation. The state's case rested largely upon the testimony of William Steele, an admitted accomplice, who testified in substance that on or about 6 o'clock of September 6, 1927, after attending a dance at de-

fendant's ranch the night before, defendant directed him, Jimmie Du Bray, and Dewey Cobell to go to what is known as the east field of Frye & Co. and bring some horses from the pasture to defendant's ranch for hog feed; that pursuant to such direction they gathered twenty head of horses and brought them to the ranch; that one of the number was a sorrel Belgian stallion, branded コ on the left side, with a white stripe in the face and white feet and legs; that thereupon defendant and others changed the brand to ᑫᔆ on the left thigh by placing the new brand over the old one; that the stallion was left in the corral at defendant's ranch and the other nineteen head of horses were returned to the field from which they had been taken; that he then went to work for Alex Du Bray, who was putting up hay for defendant about two miles from the ranch buildings; that on September 19, at about noon, the haying was finished and the crew started for the ranch buildings; that when he got there he met defendant, who told him that they would have to do something with the stallion; that soon after he (Steele) started to take a team to Du Bray's ranch, intending to return to defendant's place; that after going some distance he left the team with another person, took a saddle-horse, and went back toward defendant's ranch; that he met defendants, Du Bray, and Cobell with the stallion; that defendant told him to take the horse into Canada and kill it; that he, Du Bray, and Cobell took the stallion about two and one-half miles north of the international boundary line, cut his throat, and removed a patch of the hide where the brand was; that about three days later defendant asked him what he had done with the horse, and he was told the facts. The ᑫᔆ brand was owned by Steele. His explanation as to why his brand was put upon the animal was that defendant said he could not put his brand on it because his (defendant's) was a shoulder brand; that defendant said that the horse would be taken across the line and left there until the brand healed up and he would sell it and divide the money; that he had been charged with

the theft of the animal, pleaded guilty, and received a suspended sentence.

Counsel for defendant contend that there is no evidence independent of the testimony of the accomplice which tends to connect defendant with the commission of the offense charged in the information.

In this jurisdiction a conviction cannot be had on the testimony of an accomplice "unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." (Sec. 11988, Rev. Codes 1921.) Mere suspicion or probabilities, however strong, are not sufficient to convict for crime. "There must be some substantial testimony, aside from the uncorroborated evidence of an accomplice, to justify a judgment of conviction." (*State* v. *Keithley,* 83 Mont. 177, 271 Pac. 449, 452.) However, it is not necessary that the accomplice be corroborated as to every material fact to which he testifies (*State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270; *State* v. *Stevenson,* 26 Mont. 332, 67 Pac. 1001; 16 C. J. 704; 1 R. C. L. 168), or that the corroborative evidence in itself be sufficient to establish a prima facie case or sufficient to justify a conviction (*State* v. *Cobb,* 76 Mont. 89, 245 Pac. 265, 267), or connect defendant with the commission of the offense charged (*State* v. *Ritz,* 65 Mont. 180, 211 Pac. 298; 16 C. J. 705). It is sufficient if the independent evidence *tends* to connect him with the commission of the crime of which he is charged; the evidence need not be direct, but may be circumstantial; it may be supplied by the defendant or his witnesses. (*State* v. *Cobb,* supra.) Whether the corroboratory evidence tends to connect defendant with the commission of the offense as required by section 11988, supra, is a question of law, but the weight of the evidence is a matter for the consideration of the jury.

Independently of the testimony of the accomplice, the record discloses that on September 1, 1927, Frye & Co. was

the owner of the stallion described in the information, which was kept in what is known as the east field. The animal was missed therefrom about that time. On September 19 Cyrus Schoop, an employee of the company and a deputy sheriff, in company with Tom Hall, another employee, began a search for the horse; they arrived at defendant's ranch about 6 in the morning; as they rode to the barn the door was open and they saw the stallion in a stall; they untied and turned the stallion around and examined the brand. Witness Schoop testified that the brand was ᴨ which had been worked over the Ⅎ brand. After this examination the horse was retied in the stall. Both Hall and Schoop knew the animal ever since it was a colt and were positive that it was the stallion that belonged to Frye & Co. Hall was sent to notify the manager of the company, and Schoop stationed himself about half a mile from the barn in a position where he could see the barn door at all times; he saw no one about the buildings until approximately 4 o'clock in the afternoon, at which time a Mr. Barton came through the field where Schoop was stationed and proceeded to defendant's barn, and shortly thereafter defendant came to Schoop and asked him what he wanted. He told defendant that he was guarding a stallion belonging to Frye & Co. which defendant had in his barn; there was no further conversation. Schoop testified that defendant got quite nervous and pale and returned to his house, then rode up the river toward the haying crew and was gone about three-quarters of an hour; that when he returned the hay crew followed behind him; when the crew reached the barn they unhitched, and soon thereafter defendant came again to where Schoop was. The latter testified: "He said, 'There is the front door in the barn.' He said, 'You can see that, can't you?' I said, 'Yes, I can see it.' That is when I asked him if he had any objection to my going down to the barn. He said, 'No, if you have a search warrant.' I didn't have a search warrant. He said, 'One hour after dark, you come down to the barn and take full possession of the barn.'" While witness and defendant were talking, the barn door opened and two horses

were driven out, followed by a rider, one a sorrel of the general description of the stallion; they were driven rapidly in a southerly direction across Milk River. Thereupon Schoop left defendant and started after the rider and the two horses, following them a distance of one and one-half miles before he overtook them; he then discovered that the sorrel he thought was the stallion was in fact a mare. He then returned to defendant's ranch, and when he got to the river he saw some riders on the hills north of the barn. At that time it was dusk or getting dark, and he gave up the search and went home without going to defendant's barn. Later Schoop, in company with others, saw the carcass of the animal in Canada, with the brand cut out. His identification was complete, not only by the brand but other distinguishing marks.

Tom Hall testified to visiting defendant's place with Schoop, finding the stallion in the barn with the worked-over brand, and that he had seen the animal in Du Bray's hay corral on September 15.

Charles Lowery testified that he was familiar with the Belgian stallion owned by Frye & Co., and that on September 12 he went to defendant's ranch; that he saw the animal on that day in defendant's corral; that he later saw the carcass of the animal in Canada with three patches of hide cut off. He further testified that he had a conversation with defendant since the commencement of the trial. "He [defendant] wanted to know what I wanted to come down here and send him to the penitentiary when I could have avoided it by saying I was not positive that that was the horse in the corral. He wanted me to come up and go to his room and see his lawyers. I told him I would. I did not go. I told him that after I had testified twice that that was the same horse, that it would not make any difference whether I said that or not."

The witness Barton, the man who saw Schoop in the field, testified that he told defendant that there was a detective watching his place; that defendant went out to see him and was gone about half an hour, then returned and went down the river, and while defendant was gone Du Bray's hay crew

stopped in the yard and were unhitching when defendant returned; that he talked to them a few minutes and went back to where Schoop was; that Du Bray took a team into the barn, unharnessed them, and then took them out of the barn; that while he was there, and after Schoop had left his position on the hill, a man on a saddle-horse led a medium-sized sorrel horse or sorrel animal out of the yard past a bunch of horses to the west; that at that time defendant was down the river.

There was also other testimony that on September 15, at Du Bray's corral, defendant talked to Alex Du Bray about purchasing a sorrel from Du Bray that would match a sorrel horse that defendant had; that there was a sorrel stallion in the corral with a white face and hind legs; that defendant roped the stallion and led him toward his ranch.

A stock inspector testified to the following conversation had with defendant: "He wanted to get out of it the best way he could. He felt he was in a bad way up there, but if he had some guaranty, or some protection, that he would be willing to come clean and lay his cards on the table. I asked him what proposition he wanted. He said that, under the circumstances, if he would come clean, it would be necessary to have a stock inspector stationed at that point, or he could not live there. I told him that there would not be any trouble with him and the Frye people, to get a man stationed there if he wanted to come clean with that mess. * * * I suggested to him that we come into the county attorney's office. He agreed to meet me there the next morning at nine o'clock. * * * I asked him who it was that led the horse out of the barn; he said that Cobell led the horse out of the barn, and Steele hazed him. * * * I asked him what they did with him. He said he didn't know but heard since what had become of the horse. I also asked him if he knew anything about the brand of the horse. He said that the horse was branded in his corral, but he was not present at the time it was branded, that is when the brand was supposed to be changed. * * * During the conversation he said he bought the horse from Steele and gave him an $85.00 saddle for it,

and when he found out it was a stolen animal he told him to get it out of there. The defendant came to the county attorney's office as agreed upon with me. He refused to make a statement." Defendant admitted having had a conversation with the inspector and that he agreed to go to the county attorney's office, but denied the other statements testified to by the inspector and set forth above.

Arthur Carter testified that about the middle of September, when defendant and others were at Du Bray's ranch, defendant caught a sorrel horse and led it away toward his ranch; that defendant told Du Bray that the sorrel belonged to him and he did not want to trade him because he was a stallion.

Defendant testified that on September 18 he went to Canada and did not return until the afternoon of the nineteenth. He admitted the conversations testified to by Schoop practically as detailed by Schoop. Regarding these conversations, he testified: "I asked him if he was hungry. He said he had not had anything to eat since morning. I offered him food. I told him to come down and eat. He didn't do it. I then went back to the ranch. My crew were at the ranch when I got back. * * * I again saw Mr. Schoop that afternoon. The occasion of my seeing him again, my wife said, 'Why don't you go and get that fellow to come in; if he is watching, he can watch from the house. He can get something to eat.' I rode back up to where he was on the hill. I told him to come down, or asked him to come down to get something to eat. He said he had to watch the barn. He asked me if he could go down to the barn. I told him, no, not unless he had a search warrant. I told him he could watch until it got dark and then he could go down and go in as far as I was concerned." On cross-examination he testified that the reason he made that statement was because "he [Schoop] was kinda goofey; I was just having a little fun with him. I was kidding * * * I was trying to think of something mean to say to him, but my mind did not work fast enough; I said it just to be mean." He denied the testimony of Steele but it is noteworthy that he did not deny or explain the testi-

mony of Lowery with reference to the conversation had with him regarding his testimony. He did not deny that the stallion was in his corral on September 12, or in his barn on September 19; his only explanation was that he was not using his barn in the fall of 1927 and was not in it on September eighteenth or nineteenth. "I kept my saddle horses in that little pasture in front of my house."

No useful purpose would be served by further analyzing or discussing the evidence. "From the very nature of the case there cannot be any fixed standard by which to determine whether certain evidence does, or does not, tend to connect an accused person with the commission of the offense of which he is accused." (*State* v. *Cobb,* supra.) In our opinion the corroborating evidence narrated above meets the requirement of the statute.

Counsel next contend that the evidence is insufficient as to the identity of the stallion described in the information. The contention is without merit. Upon this question we think the testimony is ample.

Finally counsel contend that the court erred in denying defendant's motion for a new trial. Upon examination of the affidavits filed in support of the motion, they are found to be of a cumulative nature, or of an impeaching character, or a want of diligence is shown. They do not come within the rule formulated by this court in *State* v. *Matkins,* 45 Mont. 58, 121 Pac. 881, 885, *State* v. *Van Laningham,* 55 Mont. 17, 173 Pac. 795, and *State* v. *Harkins,* 85 Mont. 585, 281 Pac. 551. The language used by this court in the *Matkins Case,* supra, is pertinent here: "Applications for new trials on the ground of newly discovered evidence are not favored by the courts. The reason is that the moving party has already had a hearing after ample opportunity to prepare his case, and that, while smarting under defeat and disappointment, he is under strong temptation to manufacture a plausible showing in support of his motion. He may be entirely willing to take the chances of a new trial, but unwilling or afraid to swear to a statement necessary to procure it. It is often the case that

the sense of loss arouses him to the diligent activity which he should have put forth before the trial. By importunity he then interests his friends and through them brings to his support evidence which, if not false, is only cumulative or impeaching in character, and the efficacy of which to produce a different result is speculative and dependent entirely upon the personal characteristics of another jury."

This was the third trial of the cause, and upon the showing made, the motion for a new trial was properly denied.

For the foregoing reasons the judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY, ASSOCIATE JUSTICES MATTHEWS and ANGSTMAN, and HONORABLE WILLIAM L. FORD, District Judge, sitting in place of MR. JUSTICE GALEN, absent on account of illness, concur.