STATE, RESPONDENT, v. McCRACKEN, APPELLANT.

(No. 7,047.)

(Submitted January 3, 1933. Decided January 18, 1933.)

[18 Pac. (2d) 302.]

*Mr. Earle T. Pickering* and *Mr. Daniel L. O'Hern,* for Appellant, submitted a brief; *Mr. O'Hern* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. T. H. MacDonald,* Assistant Attorney General, and *Mr. F. N. Hamman,* County Attorney of Carter County, submitted a brief; *Mr. MacDonald* and *Mr. Hamman* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

William McCracken, Nig Hickey and Earl Music were accused of stealing a gelding. They pleaded not guilty to the information. McCracken, tried separately, was found guilty and has appealed from the judgment entered upon the jury's verdict. Upon motion of the county attorney the case was dismissed as to Hickey and Music.

The evidence shows that the animal described in the information, a sorrel gelding branded MA on the right shoulder, the property of Amos Burnside, was seen by its owner on the open range near the Burnside ranch in Carter county, Montana, about Christmas, 1930; and it tends to show that in January, 1931, this gelding was in a field of McCracken's with other horses, twenty or more; among them were horses belonging to Simon M. Oliver, a ranchman living in the neighborhood—the country is spacious, and while some of these men lived ten miles or more apart they referred to one another as neighbors.

Reuben Harper, who was then living a short distance south of the Montana-Wyoming line, passed this field twice at intervals a week apart in January, 1931, and on both occasions saw these horses therein. He knew the Oliver horses well, and reported to Oliver, who was his father-in-law, that the horses were there. In the early morning of February 5, 1931, it was "just nicely daylight," Harper said, he observed Hickey and Music driving the bunch of horses he had seen in the McCracken field in a southerly direction, toward Moorcroft, Wyoming. He recognized the Oliver horses. That evening he told Mr. Oliver what he had seen, and the next morning the two started for Moorcroft, traveling in Oliver's car. When they came within two or three miles of that town they overtook the horses being driven by Hickey and Music. There were five head of Oliver's horses in the bunch. From their starting point Harper and Oliver had driven between fifty and sixty miles. They then went into Moorcroft, where they spent the night. McCracken was in Moorcroft that evening and spent the night there, as did Hickey and Music. The next morning Oliver and Harper found Oliver's horses five miles south of Moorcroft; they had been driven up a lane. The main bunch of horses was north of the highway, right close to Moorcroft. There was a sorrel horse among them.

At two points during the presentation of the state's case, ▮ counsel for the defendant moved to strike out the testimony relating to the Oliver horses, on the ground that it had

not been shown that McCracken was connected with the act of driving them from his pasture to the vicinity of Moorcroft. The court overruled both motions. It is claimed that the court erred in so doing, but we do not see it. The Oliver horses were in McCracken's possession, in his pasture, and Hickey and Music were his employees. The fact that the Oliver horses were separated from the bunch and driven miles away after Oliver, the owner, and his son-in-law, had overtaken the drivers near Moorcroft, has a relevant bearing. In the absence of a contrary showing, it might reasonably be inferred by the jury, the surrounding facts and circumstances considered, that it was the design of McCracken, Hickey and Music to ship the Oliver horses as the others were shipped, and that this design would have been carried into effect if it had not been for the appearance of Oliver and Harper. At any rate, the testimony was admissible as a part of the *res gestae*. (*State* v. *Broadwater*, 75 Mont. 350, 243 Pac. 587.)

In tracing the asportation of the sorrel gelding from the McCracken pasture to the place where McCracken disposed of him, Randolph, Iowa, it was relevant to show all the acts and circumstances accompanying the asportation, even if the evidence showed or tended to show the asportation of other horses on the same expedition. Moreover, "in making proof against the defendant, it is competent for the prosecution to put in evidence all relevant facts and circumstances which tend to establish any of the constituent elements of the crime of which the defendant is accused in the case on trial, even though such facts and circumstances tend to prove that the defendant has committed other crimes." (8 R. C. L. 199.)

The horses were inspected by a deputy sheriff at Moorcroft in the presence of McCracken, Hickey and Music; McCracken assisted Parks, the inspecting officer, in the work. McCracken at the time of the inspection produced a bill of sale purporting to bear the signature of Charles G. Meyer and to transfer to McCracken ten head of horses. Special attention was directed to the sorrel gelding by the inspecting officer, who called the brand on the horse M̲A̲, while the bill of sale called for the

brand M4; and there appeared to be some difference between the inspector and McCracken as to horses described in the bill of sale as "diamond cross." The officer said to McCracken on inspecting the brand upon the horses, "The cross looks like a blotch in the center of this diamond," to which McCracken replied that the cross was so small it looked like a blotch. Apparently the inspector took McCracken's word for it.

The evidence tends to show that the horses claimed by McCracken to have been branded with the diamond cross were in fact branded with a diamond dot, and were the property of Casey Brothers, who were neighbors of McCracken.

At Randolph, Iowa, McCracken sold the gelding described in the information, and another horse belonging to Burnside; both were in the shipment.

McCracken testified that he did not drive the horses to Moorcroft for shipment; they were driven by his employees Hickey and Music, and he himself went to Moorcroft in a car; he did not see the horses after they left his pasture until they got to Moorcroft; when they got there they were put in the stockyards. He said he did not have the Oliver horses in his bunch. He claimed the "M4 horse" and the "diamond cross" horses were among the ten head which he bought from Charles G. Meyer, and that they were included in the bill of sale which he exhibited to the inspecting officer at Moorcroft; he knew Burnside's brand to be MA bar on the right shoulder.

He testified that when he was at Randolph he discovered "some of the brands, or one of the brands, on the bill of sale didn't correspond with the animal" which he had shipped. He said, "How I discovered that, or how that happened, I caught this horse and in catching him in the corral he got kind of sweated up and his hair kind of laid down on him, and I noticed then that there had been a mistake or misunderstanding in the brand; this horse had a MA bar on him. I was not excited in any way that time about shipping a MA bar horse, because Mr. Burnside told me on two different occasions to ship his horses; so I did not think a thing about that." He

testified further that two or three days after he arrived home from Omaha he heard there was difficulty about the shipment of the MA bar horses; he heard Mr. Burnside said someone had shipped some of his horses; so he went to see Mr. Burnside, told him he had shipped two of his horses, and offered to pay for them. This is McCracken's version of what Burnside said: "He said, 'That was all right, but,' he said, 'the only thing, you should have dropped me a card when you shipped them,' he says, 'I was misinformed,' he says, 'that is the only mistake you made, not letting me know'; I says 'I was busy, and,' I says, 'as quick as I heard this, I thought I would come down and see you.' The horses were sold; the sorrel horse brought $40 and the mare brought $32. I offered to pay Mr. Burnside at that time. He says, 'That would be perfectly all right, but,' he says, 'I kind of started this other business with the association,' he called it, 'and I can't do that at this time until I get it straightened up with them.' "

With respect to Burnside having given him authority to ship horses, McCracken testified: "He and I and Mr. Torgerson were talking about selling the horses and shipping them, Mr. Burnside told me if I struck any of his, to put them in and ship them. That wasn't the only time he ever told me to ship his horses; he told me another time; I think it was in 1927 or 8. The time approximately, that Mr. Torgerson and I were at Burnside's and he told me I might ship his horses at the time I ran onto them, was along before Christmas of 1930; and the other time that Mr. Burnside told me I might ship his horses, I believe, it was in 1928, up to my corral * * * He told me at that time, and at all times, when I was gathering horses and I ran onto MA bar horses, that I had the right to ship them and notify Mr. Burnside."

Torgerson testified that he was present at a conversation between McCracken and Burnside in January, 1931, in which Burnside asked McCracken if he had been out riding for any horses, and McCracken, said, "Not lately," and that Burnside then said, "If you round up any horses of your own take

mine along if you find them," and in the same conversation: "Well, if you find any of my horses, I wish you would take them along and ship them. I want to ship the whole shootin' match."

Burnside testified in the state's case in chief that he had never given McCracken permission to ship those horses; had not given anybody permission to ship them. On cross-examination he said that the first time McCracken talked with him about the sorrel horse was on the 23d of February. "Mr. McCracken says, 'I shipped your horses.' It stunned me. It surprised me really to think he had shipped my horses. I says, 'Well, how does it come you shipped my horses? What authority did you have to ship my horses?' He says, 'I had room in the car and I had them along there and I thought you wanted to sell anyway and I just put them in the car.' I never had given McCracken permission to ship my horses, or sell them." Burnside was not called to the stand in rebuttal of defendant's case.

Three assignments of error relate to the refusal of the court ▆▆▆▆ to give instructions 9, 10 and 11, requested by counsel for the defendant; 9 and 11 were faulty and the court was right in refusing them. Requested instruction No. 10 reads as follows: "You are instructed that if the defendant honestly believed that when he took possession of and shipped said animal, described in the information, that the owner of said animal had given him authority to dispose of the same, and the defendant in good faith disposed of said animal under a claim of right so to do, he is exempt from the charge of larceny, however mistaken the claim in fact might be, and you should acquit him."

As we have seen, a material element of McCracken's defense was that he had been authorized by Burnside to gather up and ship range horses belonging to Burnside. Obviously, the defendant could not have had the criminal intent necessary to guilt if in taking, shipping and disposing of the animal described in the information he honestly believed he had the right to do so, and the jury should have been instructed to

that effect. (*Commonwealth* v. *Hurd,* 123 Mass. 438; *State* v. *Barrackmore,* 47 Iowa, 684; *Barnes* v. *State,* 103 Ala. 44, 15 South. 901; *Vance* v. *State,* 34 Tex. Cr. Rep. 395, 30 S. W. 792; *Meerschat* v. *State,* (Tex. Cr. App.) 57 S. W. 955; *State* v. *Russell,* 84 Wash. 607, 147 Pac. 194; Hughes on Instructions to Juries, secs. 102, 103.) The principle is embraced in section 11384, Revised Codes 1921.

"A defendant is entitled to have an instruction given, when it announces the law, responsive to every element of his defense shown by the evidence." (8 Cal. Jur. 335; *People* v. *Hemple,* 4 Cal. App. 120, 87 Pac. 227; *People* v. *Newcomer,* 118 Cal. 263, 50 Pac. 405; *People* v. *Gallagher,* 107 Cal. App. 425, 290 Pac. 504; *Roe* v. *State,* 45 N. J. L. 49; *Black* v. *State,* 38 Tex. Cr. Rep. 58, 41 S. W. 606.)

The court did not give any substantive instruction on this material defense.

The instruction offered is not commended as a model, but it presented substantially the correct principle of law and was not vulnerable to any objection made against it at the time it was offered. It or some instruction covering the same matter should have been given. Without it the defendant was deprived of a substantial right.

For this prejudicial error the judgment is reversed and the cause is remanded to the district court of Carter county, with instruction to grant the defendant a new trial.

ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS, STEWART and ANDERSON concur.