STATE, RESPONDENT, v. GRIMSLEY, APPELLANT.

(No. 7,198.)

(Submitted March 5, 1934. Decided March 13, 1934.)

[30 Pac. (2d) 85.]

Mr. *John A. Tressler* and Mr. *George E. Hurd*, for Appellant, submitted a brief; Mr. *Hurd* argued the cause orally.

Mr. *Raymond T. Nagle*, Attorney General, and Mr. *Enor K. Matson*, Assistant Attorney General, for the State, submitted a brief; Mr. *Matson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

J. B. Grimsley was convicted, in the district court of Phillips county, of the crime of grand larceny; he has appealed from the judgment and from an order denying him a new trial.

The information on which the conviction was had charges that the defendant feloniously took one red and white bull calf and one red and white heifer calf from the possession of the true owners, "Etchart and Oxarart, a partnership consisting of John Etchart and J. M. Oxarart," with the intent to steal the same.

The specifications of error challenge the sufficiency of the evidence and the legality of the verdict, this last on the ground that the jury disregarded the instructions upon certain vital points in the case.

It is first asserted that the state failed to prove the partnership alleged. On this phase of the case the court instructed the jury that the allegation of the information quoted above "is a material allegation" which must be proved beyond a reasonable doubt, and that before the defendant could be found guilty, the jury must believe from the evidence, beyond a reasonable doubt, that the calves were owned by the partnership.

Both Etchart and Oxarart testified that the two were partners in the cattle business and that the two calves in controversy were owned by them as partners. The evidence discloses that the two men had some sort of working agreement, the former owning, and the latter running, the stock cattle, the two jointly owning the increase; Etchart was the business and financial manager. Oxarart at times referred to "my cattle," but corrected his testimony by saying that they belonged to him and Etchart. Etchart, explaining the conduct of the business, closed with: "Mr. Oxarart is just there and works." But this statement was made in connection with the declaration, "We are equal partners."

This evidence may fall short of technical proof of a partnership where its existence is in issue, within the rules laid down in *Weiss* v. *Hamilton,* 40 Mont. 99, 105 Pac. 74; but the particular ownership of the property stolen is not "of the essence of the crime." "The fraud is against the owner, but the crime is against the state, and not against the owner, owners or ownership." The applicable statute defines "larceny" as a taking "from the true owner" (sec. 11368, Rev. Codes 1921), but does not define the character of the ownership, whether general, special, joint or several, absolute or qualified, and while the ownership must be alleged, the allegation does not give character to the act, but is merely a matter of description. (*State* v. *Mjelde,* 29 Mont. 490, 75 Pac. 87; *State* v. *Van,* 44 Mont. 374, 120 Pac. 479.) The same strictness of proof is not required as in the proof of the material facts. (31 C. J. 840.)

The proof of the partnership was sufficient for the purposes of the prosecution, and the verdict is not contrary to the instruction mentioned.

The evidence on behalf of the state is to the effect that Etchart and Oxarart were engaged in the cattle business some twenty-five miles distant from defendant's ranch, but had wintered cattle at the Koss ranch, near that of defendant, in 1930 and 1931, and cattle so wintered would drift back to the neighborhood. Both the complaining witness and the defendant raised Hereford or "white-faced" cattle. During the summer and fall of 1932 on an average of once every two weeks Oxarart had seen two of their cows, with unbranded calves—one a bull, the other a heifer—on the open range in the vicinity of the Koss and Grimsley ranches. Oxarart testified to certain exceptional or peculiar markings on each of the calves, by which he could identify them, aside from the fact that he was fairly well acquainted with them. Charles Koss had also observed these animals; on November 15, he found the two cows, without calves and with their bags "fairly full"; he rode to the Etchart ranch the next day and reported the fact to Oxarart. On November 17 Koss and Oxarart

rode to the Koss ranch and the next morning found the two cows in a lane about two miles from defendant's home. They drove the cows a distance about two miles and left them; when the men returned, the cows had come back to the place where they first found them. At this point there was a gate on defendant's side of the lane; entering this gate the men discovered tracks of two calves and two horses, from which they deduced that all of the animals had been on the run, as a light snow and mud had been thrown back from the tracks. The men followed the tracks to within a short distance from defendant's corral; in the corral they found a bull and a heifer calf, unbranded, with five branded calves.

Oxarart did not in set terms claim to the defendant that the calves were his; he merely mentioned that the bull calf looked familiar to him and asked permission to bring the cows to the corral to see if they would claim the calves, to which the defendant assented, but Oxarart did not act on the permission. On the invitation of the defendant, Oxarart stayed with him that night, and after Koss left, the defendant said, "Mitch, this is frame-up work," to which Oxarart replied, "No, no frame-up work that I know of; I found two cows without any calves and follow the track clear out here." The defendant then said, "Well, you leave these calves right here; keep this under your hat and I square up with you."

The next day Oxarart went to the county seat, consulted with the county attorney and stock inspector, and on November 21 returned to the defendant's ranch in company with the stock inspector and under-sheriff. Oxarart pointed the two calves out to the officers and claimed them as the calves of the two cows mentioned. Each of these men testified that, while the other calves in the corral were "white faces," they were lighter colored and had an entirely different appearance from the two calves in question—"they looked like skim-milk calves."

The stock inspector instructed Oxarart to get his cows and bring them to the corral; as he left for this purpose the defendant sought to talk with him alone, but the under-sheriff intervened and the defendant would not talk in the presence of

the officer, who then left in his car with Oxarart. The defendant invited the stock inspector into the house and then excused himself to attend to "some chores"; he went to the corral and shot the two calves and then proceeded to dress them.

A young girl testified that in November she had seen two men on horseback—one a large man and one smaller—driving two calves toward defendant's place; the defendant is a large man; his son-in-law, who helps him with his cattle, is smaller.

The stock inspector testified that, after Oxarart and the under-sheriff left, he asked the defendant if those two calves were branded and was told that they were; after the defendant had taken the hide off of the bull calf, he examined it and found no brand.

The defendant's story, supported by the testimony of his wife, his daughter, and his son-in-law, is that the bull calf was from a cow raised by the daughter on a bottle; that the cow and calf had been near the ranch all summer and fall; that the calf had not been branded because one Ed. Herman had suggested that if it developed properly he might buy it for stock purposes. These witnesses testified that the cow and calf were driven into the corral about November 8. Herman, however, did not purchase the calf, and the defendant decided to butcher it, as he had contracted to deliver two beeves in Malta; he put the heifer in the corral to furnish the second beef. According to his story, he kept these two calves in the corral on feed and off their mothers from November 8 to 21, with the intention of butchering them and selling the meat. As to the heifer calf, the defendant testified that at branding time he branded some sixty to seventy calves, but missed eight or ten; the heifer calf here described being one of them. According to the witnesses for the defendant, all of the calves in the corral were approximately of uniform color and appearance. It snowed quite hard on or about November 12; during the snowstorm the defendant and his son-in-law ran across the Etchart-Oxarart cows with their unbranded calves, and the son-in-law reported the fact to Koss.

Defendant's counsel argue that because the testimony of their witnesses to the effect that the two calves had been in the corral from and after November 8 was uncontradicted, it must be accepted as proven, and therefore the testimony with reference to the tracks in the snow has no probative value. True, the testimony of the defendant and his family was not contradicted, nor was the state in a position to contradict it; but it was contrary to the strong circumstantial evidence indicating that the two calves were taken from their mothers and driven to the ranch after the snow.

Herman and his wife testified that the bull calf they saw at defendant's corral on November 8 was the same calf they had seen but once, at an early age, four months earlier; but neither of them testified that the calf they saw was the one killed at the corral on November 21.

It was for the jury to say whether or not the explanation given by the defendant and his witnesses, as to the possession of the animals in question, was true or false. (*State* v. *Trosper,* 41 Mont. 442, 109 Pac. 858.) In the *Trosper Case,* however, the defendant's wrongful possession alone was not sufficient to warrant a conviction, for, apparently, the only other evidence in the case was that the animal described had been stolen by someone, thus leaving the defendant's felonious intent unproven. Here the animals were either those alleged to have been stolen, or they belonged to the defendant, and, as noted above, there was considerable circumstantial evidence tending to show asportation of the Etchart-Oxarart calves by the defendant.

If the evidence for the defense raised a reasonable doubt in the minds of the jury as to defendant's guilt, he was entitled to an acquittal. (*State* v. *Trosper,* supra.) But the jury were warranted in disregarding the testimony of the defendant and the members of his family, even though it was not directly contradicted, if they did not believe it to be true. (*State* v. *Willette,* 46 Mont. 326, 127 Pac. 1013; *State* v. *Booth,* 46 Mont. 334, 127 Pac. 1017.) Such disregard, in the circumstances, does not render the verdict "against law," for without direct

contradiction, that testimony was contradicted by the facts and circumstances proven by the state, which were sufficient to prove that the calves belonged to Etchart and Oxarart—not to the defendant—and were taken from their mothers by the defendant and by him slaughtered; these facts and circumstances, together with the acts and statements of the defendant at the time of Oxarart's first visit, and at the time of the investigation by the officials, "tending toward defendant's guilt" (*State* v. *Francis*, 58 Mont. 659, 194 Pac. 304, 308), were sufficient to establish every element of the crime charged "beyond a reasonable doubt."

Finally it is contended that the court erred in overruling defendant's motion to strike the answer of Charles Koss to the question as to how the two cows he found without calves were "acting," that "they acted like they were looking for calves, like their calves were gone," on the ground that it was purely a conclusion of the witness.

In the first place, the evidence had little importance. There was no dispute that the two cows had lost their calves within the last few days, and it is certain that they would be looking for them; the condition of the cows' bags would indicate that they had not been gone long. The evidence might have had some bearing on the test proposed to determine whether or not the cows would claim the calves found in defendant's possession, a test, incidentally, which the defendant blocked of application. However, the answer was but a cattleman's composite statement of collective facts, which he could not readily detail to the jury and is not to be rejected as a mere conclusion of the witness, especially as it had to do with a collateral matter. (*State* v. *Vanella*, 40 Mont. 326, 106 Pac. 364, 20 Ann. Cas. 398; 22 C. J. 521.) "The conduct or habits of animals, and the conditions or emotions of which they are in whole or in part a reaction may be stated in a shorthand way, by one who has observed it. Where, however, all the facts can be placed before the jury so as to enable them to form a reasonable inference, the conclusion of the witness is an intrusion on their function and is excluded." (22 C. J. 558.) It might have

been possible for the witness to have described the actions of the cows so as to enable the jury to form a reasonable conclusion as to the actions of the two cows, but under the circumstances of this case the refusal of the court to strike the testimony did not constitute reversible error, under the rule that "after hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." (Sec. 12125, Rev. Codes 1921; *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494; *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407.)

No reversible error appearing in the record, the judgment and order must be affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.