STATE, RESPONDENT, v. AKERS, APPELLANT.

(No. 7,725.)

(Submitted December 10, 1937. Decided January 3, 1938.)

[74 Pac. (2d) 1138.]

44

*Mr. John L. Slattery*, for Appellant, submitted a brief, and argued the cause orally.

*Mr. Harrison J. Freebourn*, Attorney General, *Mr. Carl N. Thompson*, Assistant Attorney General, and *Messrs. Marron & Foor*, for Respondent, submitted a brief; *Mr. Thompson* and *Mr. Hugh N. Marron* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Defendant was found guilty of the crime of grand larceny, alleged to have been committed on January 23, 1936, in Roosevelt county. He has appealed from the judgment of conviction, from an order denying his motion for new trial, and from an order denying his motion to set aside the judgment for want of jurisdiction.

The information charged six defendants with the larceny, but at the commencement of the trial the action was dismissed as to all defendants save Akers, appellant here, and William Steele. Steele was granted a separate trial. He was the principal witness for the state in the trial of this case; subsequent to the trial of this case he pleaded guilty. The subject-matter of the larceny was a gray saddle mare branded V Lazy 8 on the left thigh, belonging to Kenneth Olson.

There was evidence that the accustomed range of the horse was around the Fred Buckles place in Roosevelt county, on

which Steele was living at the time of the alleged offense. The last time the owner, Olson, saw the animal was about the middle of September, 1935. The horse was branded on the left thigh with the brand $V_\infty$ and had indistinct brands on the right thigh, which some witnesses said looked like a Lazy 7 Lazy M over bar, and an S slash 9. Olson acquired the horse from Eddie Smith in 1932, who was then the owner of that brand. The horse had a crack or split in the left hind hoof. A horse answering this description was later found in Janesville, Wisconsin, where it had been shipped by rail along with others making up a carload. Witnesses who were familiar with the Olson horse saw it in Wisconsin and identified it as the Olson horse. A man by the name of Fred Radons accompanied the shipment to Wisconsin; but the money paid for the horses by the Wisconsin purchaser was issued to Marsh and Radons.

Steele testified that he knew Olson and that he had seen him riding a gray horse around the Buckles place, with a split hind hoof and with the brand V Lazy 8 on the left thigh; that he saw the horse in January, 1936; that it watered about a quarter of a mile from the Buckles house; that Akers and Louis Marsh came to the Buckles place about December 15, 1935, and talked about horses; they wanted to see horses which the witness was keeping for Akers. He said that Akers asked him to round them up; he did so and brought in about fifteen other horses that were with them. They were placed in the Buckles corral. Marsh at that time said he wanted to buy some horses; he pointed out certain ones that he thought he could sell or handle. The witness said that Marsh stated, ''If he had those horses down there, he thought he could pass them; ship them, and he said he had some brands that resembled some of these. * * * He said he had some bills of sales that resembled the brands that were on some of these horses I had in the corral''; that Akers then said, ''Louis was alright, and he thought maybe we could pass some of these horses.'' The gray horse with the split hoof and the $V_\infty$ brand was among the horses in the corral that day. About a week later he saw Akers again and the latter told him to round up some of these horses, ''that he thought that they

was going to take them over to Plentywood." The next time the witness saw Akers was about the middle of January. Akers then brought Ernest Summers out in the evening. The next day he brought Sherrill out. Akers then said, "We'll go out and round up some of these horses and get to working on them." The witness said that he and Akers went out on horseback to gather the horses around the Buckles place. They gathered around sixty head and put them in the corral; then they started cutting them out. The gray horse with the split hoof and $V_\infty$ brand was in the bunch and the witness told Akers that one belonged to Olson. Akers got on that horse and used it in the corral to cut out the horses with. After cutting out some of the horses there were seventeen left, including the gray one with the split hoof, and four that belonged to Akers which Steele was keeping for him. Akers, Summers and Sherrill took the seventeen head out of the corral and started to drive them east. Akers just went a short distance with them and then returned. Two or three days later the witness saw Akers at Poplar. Steele testified that Akers then stated that he "couldn't get all the money that he wanted for these horses; in fact he said he lost some in going over. Then he said that he could get only $400, and he said I was supposed to pay one of the boys $25, and he was supposed to pay the other boy $25. He gave me $175. I did not pay any of the boys." On cross-examination he testified that there were five men engaged in corralling the horses on the day in question. Those five were Sherrill, Ernest Summers, Hamilton, Akers, and himself; and he said: "Each one knew what the horses were being corralled for. I say that from the conversation and conduct that took place out there."

Summers testified that he was employed by Akers to drive horses and was promised $25 for so doing. Akers took him to the Buckles ranch on January 22, where Steele was then living, and where he stayed overnight. The next day Akers returned with Sherrill. Steele rounded up the horses. Akers cut them out of the corral, using a gray horse in so doing. All were cut out except about twenty head. The gray one, used by Akers in cutting out those not wanted, was one of those left in the corral

and which was later taken with the rest to Summers' place. Summers, Sherrill, and Akers started driving the horses from the Buckles place. Akers went just a mile or two and then returned. He and Sherrill took the horses to Al Burshia's home, about thirty miles north and east of the Buckles place. They arrived there about 10 o'clock at night and put the horses in an inclosed wheat field about a mile from Burshia's house. They stayed at the Burshia home that night and put their saddle horses in the barn. They gathered up the horses next morning, but he did not know whether they were the same bunch that they started with from Steele's place, as there were a "lot of horses there"; but he said, "I think I noticed this gray gelding among the horses when I was driving them from Burshia's place to our place." The horses were taken to Summers' home by Summers and Sherrill. When they arrived there Louis Marsh was there. Shortly after they arrived there with the horses, Akers came there in a car. The witness drove the horses, together with seven head belonging to his mother which she had sold to Louis Marsh. Sherrill went with Akers in his car. The witness drove the horses to Marsh's place and put them in a corral. There he .cut out three head; the rest he took to Raymond. The three that he cut out were some that his mother had sold to Marsh. He drove them through Plentywood to Raymond and put them in the stockyards at that place. He then returned from Raymond to Plentywood with Marsh and stayed there over night. Marsh paid him $25 for driving the horses at the direction of Akers. On cross-examination he testified that so far as Akers was concerned he merely employed him to drive the horses to the Summers place, and whatever he did with the horses after that was at the direction of someone other than Akers.

Sherrill testified that he also was employed by Akers to drive horses and that Akers took him to the Buckles place where Steele was living. He corroborated Summers up to the point when he left him at the Summers home. He said that the horse which Akers was riding while cutting out the horses was in the bunch that he and Summers drove to the Summers home. This

horse was still in the bunch when they drove them from Burshia's to the Summers home. He said Akers took him from the Summers home to Plentywood in his car.

Hamilton testified substantially as did Summers and Sherrill with relation to what transpired at the Buckles place on January 23. In substance, he testified that Steele rounded up the horses and gave orders as to what ones should be cut out and what ones were to be left in the corral.

At the time of the trial, and after all the other evidence had been introduced, the state sought and obtained leave to indorse the names of Eddie Smith and William Walker on the information as witnesses of the State. Smith testified that he owned the $V_\infty$ brand; that he executed a bill of sale to Olson when he sold him the horse bearing that brand; and that he obtained the horse from Walker in 1931 on a trade.

Walker testified that he traded a light-colored horse to Smith in 1931. He had acquired the horse from one Hoffman, a truck gardener, and owned it only for a couple of days. He did not put any brand on the horse, but traded it to Smith in the same condition as when he received it from Hoffman.

Defendant introduced no evidence except a stipulation to the effect that the V Lazy 8 brand on the left thigh was a recorded brand in the name of Edward H. Smith, of Poplar, prior to January 1, 1932, and has not been a recorded brand since that date; that the Lazy 7 Lazy M over bar brand on the right thigh was a recorded brand in the name of William Young prior to January 31, 1932, and was not a recorded brand since then. The S slash 9 brand was recorded in the name of Constance E. Bear, Poplar, Montana, prior to January 31, 1932, and was not a recorded brand since then.

Several specifications of error are relied upon by defendant, which we will now discuss. He contends that the court erred in denying his motion to instruct and direct the jury to return a verdict of not guilty. One ground of this motion was that there was a variance, and his counsel contend that the evidence showed that, if the defendant was guilty of any offense, it was only the offense of receiving stolen property, knowing it to have

been stolen. The testimony of Steele shows a preconceived plan between him and defendant to steal and transport horses. This testimony, however, is subject to distrust for the reason that he is admittedly an accomplice.

Section 11988, Revised Codes, provides that: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof." This court has construed this section to mean that while there can be no conviction upon the uncorroborated testimony of an accomplice, yet the accomplice need not be corroborated upon every fact to which he testified, nor that the corroborating evidence be sufficient, if standing alone, to convict, nor absolutely connect the defendant with the crime. It is sufficient if the corroborative evidence tends to connect the defendant with the perpetration of the crime charged. (*State* v. *Jones,* 95 Mont. 317, 26 Pac. (2d) 341; *State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026; *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270; *State* v. *Stevenson,* 26 Mont. 332, 67 Pac. 1001.)

For corroboration of Steele's testimony, we are directed to the testimony of Summers and Sherrill. If these two witnesses were not themselves accomplices, then their testimony to the effect that the defendant Akers hired them to drive horses, that the stolen horse was one of the horses they were directed by Akers to drive, that they were paid according to the agreement made with them by Akers, and other circumstances shown otherwise than by Steele's testimony, is plainly sufficient to tend to connect the defendant with the commission of the offense testified to by Steele.

While it is not urged here, the question of whether Summers and Sherrill were themselves accomplices is decisive of whether their testimony was sufficient corroboration under the statute. The exact status of Summers and Sherrill in relation to this crime was one of fact, and it was within the province of the

jury to determine, under appropriate instructions, whether these two witnesses were in fact accomplices. (*State* v. *Slothower, supra.*)

It was for the court to determine whether there was sufficient corroborating evidence. (*State* v. *Yegen,* 86 Mont. 251, 283 Pac. 210.) The only substantial evidence which tends to Sherrill. This presents a situation whereby the court could connect the defendant with the larceny is that of Summers and not say there was corroborating evidence until the fact of whether Summers and Sherrill were accomplices was decided by the jury. The court below met this situation properly by giving the following instruction:

"An accomplice is one who knowingly and voluntarily and with common intent with the party offending unites in the commission of a crime. One may become an accomplice by being present and joining in the criminal act, by aiding and abetting in its commission, or, not being present, by advising and encouraging its commission; but knowledge and voluntary action are essential in order to impute guilt.

"You are instructed that the testimony of an accomplice ought to be viewed with distrust. A conviction cannot be had on the testimony of an accomplice, unless it is corroborated by other evidence which in itself without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; but the corroboration is not sufficient if it merely shows the commission of the offense or circumstances thereof.

"It is for the jury to determine, in the light of this instruction, what witness or witnesses, if any, are accomplices, and if they find from the evidence any such witness or witnesses are accomplices, their testimony must be weighed in accordance with this instruction. One accomplice cannot corroborate another."

Since the testimony of Summers and Sherrill is the only substantial evidence tending to connect the defendant with the crime, and since the jury found defendant guilty, we must presume that the jury found that Summers and Sherrill were not

accomplices. After there has been the necessary corroboration of the testimony of an accomplice, the jury may then weigh the entire testimony of the accomplice in order to determine the guilt of the defendant.

There was sufficient evidence to support the conviction of the defendant.

The second ground for the motion was that the state had wholly failed to prove the identity of the horse as alleged. We think that the identity of the horse was sufficiently proven. Olson's description of the horse conformed to the description in the information. The horse was traced by its brand, color, and split hoof, by Steele, Summers, Sherrill, Marton, and Buckley, from the Buckles place to Wisconsin. In support of his contention on this point, the defendant relies upon the fact that there were other brands on the horse than the one alleged in the information. This circumstance was immaterial.

In the case of *State* v. *Collins*, 53 Mont. 213, 163 Pac. 102, 104, it was said: "The evidence fully identified the animal described in the information, not only by proving clearly its color and weight, but also the brand and white stripe in the forehead. Incidentally it was made to appear that the animal bore another brand on a different part of its body. It is argued that proof of the additional brand presents a variance fatal to the state's case. The burden is upon the state to prove the description as alleged. When this has been done, the case thus made is not affected if the evidence discloses other descriptive marks."

The defendant next contends that there was a failure of proof of ownership in Olson. The reasoning of the defendant is to the effect that the horse in question had two other brands besides the one described in the information; that the other two brands, because they were unvented, showed prima facie ownership in the owners of the brands, and therefore there was no title passed through Walker and Smith to Olson.

Prior decisions of this court have pointed out that ownership of the property in a larceny case must be shown so as to identify the property to the end that the defendant may, by proper plea, protect himself against another prosecution for the same

54

offense. (*State* v. *Moxley*, 41 Mont. 402, 110 Pac. 83.) But "the particular ownership of the property stolen is not 'of the essence of the crime.' 'The fraud is against the owner, but the crime is against the state, and not against the owner, owners or ownership.' * * * And while the ownership must be alleged, the allegation does not give character to the act, but is merely a matter of description." (*State* v. *Grimsley*, 96 Mont. 327, 30 Pac. (2d) 85, 86, and see *Henry* v. *United States*, 49 App. D. C. 207, 263 Fed. 459, and *State* v. *Hennessy*, 23 Ohio St. 339, 13 Am. Rep. 253.)

Ownership of livestock in a larceny case can be shown, as it was here, otherwise than by the recorded brand. (*State* v. *Christy*, 131 Or. 314, 282 Pac. 105; *State* v. *Warner*, 91 Or. 11, 178 Pac. 221.) The brands here, being unrecorded, were merely descriptive marks, the same as any other identifying marks.

Olson testified that he is the owner of this horse. There is corroborating testimony by two other witnesses, besides Steele, as to the ownership by Olson. The subject of this particular larceny and the ownership were sufficiently designated and identified to prevent the defendant from being prosecuted again for this particular offense.

The next contention is that, since there was no showing that Akers had anything to do with the horses after they arrived at the Summers home, the testimony of Summers, Marton, Wallace, and of other witnesses relating to the presence of the horse in Wisconsin after the date of the larceny was inadmissible. In examining the record we find evidence to the effect that there had been a concerted plan to steal these horses and ship them under bills of sales which would cover these particular horses because of their similarity with the brands, and that the defendant was one of the participants in this plan. The disposition of the horses then was competent to show the success of the plan. Defendant had no right to have the evidence restricted to the link in the chain of the crime as to which he personally participated, but evidence showing all the circumstances involved in the criminal transaction was admissible where the

whole transaction related to the carrying out of one larcenous intent. (See *State* v. *Broadwater,* 75 Mont. 350, 243 Pac. 587; *State* v. *McCracken,* 93 Mont. 269, 18 Pac. (2d) 302.) We find no merit in this contention of defendant.

The next contention is that the court erred in granting the request of the state, over the defendant's objections, to use witnesses whose names were not indorsed on the information until after the trial had been in progress. The defendant complains that the action of the state in using these witnesses took him by surprise, and that the testimony given by them was prejudicial.

We are aware of section 11805, Revised Codes, which requires the county attorney to indorse the names of the witnesses for the state on the information at the time it is filed, if they are known. The purpose of this section is to apprise the defendant of his accusers and give him time to prepare to meet their testimony. The section, however, does not prevent the state from using witnesses who were not so indorsed. (*State* v. *Harkins,* 85 Mont. 585, 281 Pac. 551.)

The defendant claims that the testimony of these witnesses was prejudicial to him, and that such prejudice is disclosed by the affidavit of Dolly L. Cusker. We cannot agree with his contention. The testimony of the two witnesses concerned related to the transfer of the subject of the larceny from one to the other, and then to the prosecuting witness Olson. The larceny here involved the trespass on the property of Olson. The chain of title preceding the ownership of Olson is immaterial so far as the culpability of this defendant is concerned. (Compare *Little* v. *State,* 21 Okl. Cr. 1, 204 Pac. 305.) There had been a sufficient showing of ownership and possession in Olson before the introduction of this testimony; consequently, the defendant could not have been prejudiced. This is not a situation wherein there has been a concealment of incriminating evidence. The evidence of the two witnesses was corroborating in character and designed to rebut the attempt on the part of the defendant to show a different ownership by the cross-examination of the state's witnesses.

Defendant contends that it was error to refuse its offered instruction reading: "You are instructed that ever since the year 1895 it has been, and still is, the law of the State of Montana that every person who sells horses, mules or cattle must vent or counterbrand such animals, and said vent or counterbrand must be upon the same side of the animal as the original brand and must be fascimile of the original brand, except that it may be reduced one-half in size, and the venting of said original brand shall be prima facie evidence of sale or transfer of said animal or animals so vented."

The purpose of the statute relating to the venting of brands (sec. 3300, Rev. Codes) is to protect persons in their honest dealings with livestock. What has already been said herein demonstrates that in a prosecution for larceny it is not necessary to show a legal title to the subject of the larceny so far as the record ownership is concerned. The offered instruction was properly refused.

Defendant urges that the court erred in denying his motion for a new trial. In support of his motion he offered two affidavits; one by Dolly L. Cusker to the effect that Smith, a witness for the state, had told her that the Olson horse was a stolen horse, and that he and another person stole the horse five years ago; and the other by John L. Slattery, to the effect that two brands on the Olson horse were recorded in the names of William Youngman and Constance Bear. This newly discovered evidence offered by the defendant was impeaching in character and is not such new evidence as will merit the granting of a new trial. (See *State* v. *Yegen,* supra.) Moreover, it was put in issue by counter-affidavits, and, that being so, we will not disturb the trial court's ruling; it not appearing that there was an abuse of discretion. (*State* v. *Laughlin,* 105 Mont. 490, 73 Pac. (2d) 718.)

The defendant next contends that the trial court did not have jurisdiction to try this case or sentence the defendant, for the reason that the defendant is an Indian and a ward of the United States government, and if any offense were committed it was committed on land owned by another tribal Indian under

a restricted allotment patent, and thus the only court which had jurisdiction was the United States court.

The defendant raised the question of jurisdiction at the time of the pronouncement of sentence. Objection that the court has not jurisdiction of the subject-matter may be raised at any stage of the proceedings, and the right to make such objection is never waived. (8 R. C. L. 96; *State* v. *Vanella,* 40 Mont. 326, 333, 106 Pac. 364, 20 Ann. Cas. 398.)

The question before us is whether the trial court had jurisdiction of the subject-matter of this crime. The crime charged was larceny. The jurisdiction of the court is determined by the place where the crime was committed. The peculiar nature of larceny may bring about a situation wherein the crime involving the same subject-matter may have been committed in several jurisdictions. (Compare *State* v. *Stevens,* 60 Mont. 390, 199 Pac. 256, and *Ex parte Groom,* 87 Mont. 377, 287 Pac. 638.) The statutory law of Montana contemplates just such a situation. Section 11712, Revised Codes, provides: ''When property taken in one county by burglary, robbery, or larceny has been brought into another, the jurisdiction of the offense is in either county.''

The testimony in this record is indicative of the fact that ▮▮▮▮▮ the theft of this horse was a common undertaking, and that the defendant was a participant in such undertaking from the time the horse was first taken until it was delivered. The evidence shows that Summers and Sherrill drove the horse, at the direction of the defendant, from the Buckles place to the Summers place, and that Summers continued to drive the horse to Raymond, which is near Plentywood. This being true, there was a continuous commission of the crime from the Buckles place to the destination of the horse in accordance with the preconceived plan. While it may be true that the defendant's part of the plan ceased at the Summers place, nevertheless his participation in the theft would make him responsible for the crime of larceny as long as the plan of theft was operative. The jurisdiction, therefore, of this crime was in any county in which the horse was driven in the carrying out of the theft.

58

The defendant raised this point by affidavit, and therein asserted that the evidence showed the commission of the crime was on the Buckles place, if any crime were committed. This conclusion is erroneous, for the record definitely shows that, in accordance with the charge in the information that the crime was committed in Roosevelt county, the particular horse, with other horses, was driven in a northeasterly direction from the Buckles place, which is seven miles north of Poplar, to the town of Plentywood. The record here shows that the horses were driven to the Burshia place, which is twenty-five miles north of Brockton. The court will take judicial notice that a point twenty-five miles north of Brockton is in Roosevelt county. (Compare *Helena Adjustment Co.* v. *Claflin,* 75 Mont. 317, 243 Pac. 1063, and *Batchoff* v. *Butte Pac. Copper Co.,* 60 Mont. 179, 198 Pac. 132.) There was no showing, or offer to show, that the Burshia place was or is Indian land. Since defendant made no showing that the entire asportation in Roosevelt county was on Indian land, the state court presumptively had jurisdiction (*In re Shaffer,* 70 Mont. 609, 227 Pac. 37), and his motion challenging the jurisdiction was properly denied. (*State* v. *Youpee,* 103 Mont. 86, 61 Pac. (2d)´ 832.)

The judgment and orders appealed from are affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES STEWART, ANDERSON and MORRIS concur.