STATE OF MONTANA, Plaintiff and Respondent, v. DUANE ALEXANDER, Defendant and Appellant.

No. 9737

Submitted January 18, 1957.  Decided February 26, 1957.

Rehearing Denied March 13, 1957.

307 Pac. (2d) 784.

98

Messrs. Doyle & Francisco, Conrad, for appellant.

Mr. Arnold H. Olsen, former Atty. Gen., Mr. Forrest H. Anderson, Atty. Gen., Mr. Leo H. Murphy, County Atty., Choteau, Mr. Louis Forsell, Asst. Atty. Gen., for respondent.

Mr. Howard T. Francisco and Mr. Forsell argued orally.

MR. CHIEF JUSTICE HARRISON:

The appellant was convicted of the crime of assault in the second degree; made a motion for a new trial which was denied; and this appeal was taken from the judgment of conviction and the order denying motion for a new trial.

The fact situation in this matter is that the complaining witness, Don Lussenden, was employed and resided at the Emil Durr Ranch west of Choteau, since October 1, 1955. On March 17, 1956, during the early morning hours when he was asleep in his room upstairs he was awakened by someone knocking on the door. He got up and was putting on his trousers when he heard another knock, and as he was going downstairs there was a third knock. He walked over to the door, flipped the light switch and turned on the 150 watt light in the kitchen, in which room the door was situated. When he had the door open about ten inches, he recognized the appellant, Duane Alexander, who had a shotgun and who attempted to bring it up into position to fire, at the same time making a statement to the complaining witness that, "Now I got you, you son-of-a-bitch." The complaining witness upon seeing the shotgun coming up slammed the door. The door hit the barrel of the gun and the appellant again tried to raise the shotgun but it

was too close to the door and he couldn't raise it. The complaining witness then started to run for the stairway which was about twenty feet away from the door. As he was going up the stairway, and at a point approximately halfway up, the appellant fired the gun. Part of the shot hit the complaining witness and the rest hit the staircasing, making about a five-inch circle on the wall. The complaining witness proceeded on to his bedroom, secured his gun from under his pillow, and then heard the appellant holler: "Come on down you cowardly son-of-a-bitch." Complaining witness then fired his pistol down into the kitchen. After that shot was fired the appellant said: "That is all right; I am ready to die anyway." The complaining witness did not go downstairs again until about 6:15 a. m. at which time he called the sheriff and the undersheriff responded to his call.

The upper-half of the kitchen door was glass; the light from the 150 watt light in the kitchen shone through the glass and the complaining witness recognized the appellant through the glass door. In addition to this he had known the appellant for approximately one year or a little better; knew his voice and recognized his voice in making the statements that are hereinbefore quoted. While the complaining witness first thought the attack took place about 2:10 a. m., by looking at a small clock he had upstairs, he later heard a large clock downstairs stop running, which clock made considerable noise when it was running and this noise of the operation of the clock stopped shortly after he got back upstairs, in his estimate, between ten and twenty minutes. Upon examination this large clock was stopped at exactly 3:30 a. m.

While some of the witnesses for the appellant claimed that the large clock did not run, the complaining witness testified that he started the large clock up and it ran all the time he was living there except when he forgot to wind it.

An empty 12-gauge shotgun shell was found immediately outside the kitchen door.

There had been no previous trouble between the complaining witness and the appellant.

Mrs. Emil Durr testified she was the owner of the Emil Durr ranch; that the appellant had worked for her on the ranch from about the middle of September 1954 until the last week of September 1955; that she had to let him go, and had employed the complaining witness in his place, and that the complaining witness started to work the first week in October 1955 at her ranch. She also stated that the appellant called her on the phone a number of times after his employment had been terminated, and as to these conversations she testified:

"A. He called me one time and asked, 'How often does your hired man come to town'. I said, 'I don't know. Whenever he needs to come in for anything, I suppose'. He said, 'I'm just telling you that one of these times when he comes in here you are going to have to get somebody else to take his place for about three weeks because you will need somebody else to do his work there during that length of time after we get through with him.

"Q. What did you say to that? A. I was indignant and slammed down the receiver. I asked him if he was threatening and slammed down the receiver.

"Q. Did the defendant call you any other time after that? A. Well, he called me one time and I said, 'Duane, why do you keep calling me all the time when you don't have anything particular to say and just keep bawling me out'. He said, 'I intend to make things just as miserable for you as I possibly can'.

"Q. Did you receive any other call after the first one you related concerning that telephone call? A. Well, after he would call and be bawling me out for numerous things, well, maybe the next day he would turn around and call up and apologize to me and say that he was sorry and that he didn't know why he had done it and I would tell him to forget it.

"Q. How many times did that happen? A. I don't know. Perhaps half a dozen times.

"Q. During what period? A. Well, I would say about the middle of October—two or three weeks after he was let out from us, and until perhaps the latter part of October."

It is significant that she received no calls after the assault upon the complaining witness.

Reuel Golding testified that he had known the appellant for about four or five years; that about a week prior to March 17, 1956, the appellant came to his home and in the course of the conversation mentioned something about coyotes and wanted to know if Golding had a gun and was advised that he did have. The defendant then said he might want to borrow it some day, but he never did come back and get it.

The defense was an alibi. Appellant's proof tended to show that he was present in the town of Fairfield around 10:00 in the evening until 2:00 on the morning of March 17, 1956. The appellant testified he left Fairfield and drove to the Blinker ranch, where he was then employed, and arrived there about 3:00 a. m.; that it required about an hour to drive from Fairfield to the ranch, and that when he got to the ranch he went to bed.

The appellant admitted he knew the complaining witness, stating that he had nothing against him; that he had no ill feeling on his part on leaving the Durr ranch. He admitted that on one occasion he had called Mrs. Durr on the phone but his version of the conversation was that he told her: "Mrs. Durr, I am hearing rumors around that I stole a cow and you are hurting me, and I will make it just as miserable for you as I can and will tell who really stole the cow." He also admitted that he called her about some papers and the title to his old Chevrolet car. Several witnesses testified as to the good reputation of the appellant in the community in which he lives.

It is further significant that the appellant did not deny that he was at the Durr ranch in the early morning hours of March 17, 1956, and fired the shotgun, as testified to by Don Lussenden, nor did he deny the telephone conversations, as testified to by Mrs. Durr.

The appellant's specifications of error charge that there is no substantial evidence to justify the verdict, that the evidence is insufficient, and that the verdict of the jury is contrary to the evidence.

The complaining witness definitely identified the appellant as the one who came to the door with the shotgun and fired the shot which hit him, no part of which is denied by the appellant. While the appellant claims that the state failed to prove any motive, it is apparent from the testimony of Mrs. Emil Durr that the appellant was displeased with her termination of his employment and was out to make life miserable for her; that in his mind, one of the ways to do so was to disable her hired man. Certainly threats of this type furnish ample motive, particularly when the crime committed is in line with the threat made by the appellant.

This court held in State v. Vanella, 40 Mont. 326, 344, 106 Pac. 364, 370:

"'* * * It is not necessary for the state to prove motive. 'The presence or absence of it is not conclusive, however, but is to be considered as any other evidentiary fact bearing upon the ultimate question of the guilt or innocence of the defendant, and is more or less significant in the light of the facts of the particular case. The finding of a motive is not indispensable, however. Were this true, it would oftentimes be impossible to secure conviction; for such is the nature of the human heart, and so various are the springs of action hidden therein, that it is often impossible to fathom it and assign any motive whatever to the act under consideration. Under such circumstances it is the duty of the jury to convict, notwithstanding the lack of proof tending to show motive, if the crime is otherwise clearly established'. State v. Lucey, 24 Mont. 295, 61 Pac. 904.''

Since it is not necessary for the state to prove a motive, if ▮ the crime is otherwise clearly established, there certainly is no merit in the appellant's contentions in this case. The evidence is clear that he was present at the time the shot was fired, and that he fired the shot.

While there is dispute in the record as to the exact time of the commission of the offense, that was a question to be resolved by the jury. As this court stated in State v. Strobel, 130 Mont. 442, 304 Pac. (2d) 606, 613:

"The jury evidently rejected the testimony of the defendant and accepted the evidence offered by the state. This it had a right to do. State v. Willette, 46 Mont. 326, 127 Pac. 1013; State v. Grimsley, 96 Mont. 327, 30 Pac. (2d) 85; State v. Semmens, 105 Mont. 113, 71 Pac. (2d) 913."

As to the other conflicts in the evidence upon which appellant relies in large measure to sustain his claim of insufficiency of the evidence, we quote again from State v. Strobel, supra:

"Other testimony on behalf of the defendant which is urged in appellant's brief as warranting a reversal of the judgment created sharp conflicts in the evidence, all of which were by the verdict resolved against the defendant. 'Disputed questions of fact and the credibility of witnesses will not be considered on appeal. Determination of such matters is within the province of the jury, and so long as there is substantial evidence to support the verdict, it cannot be disturbed on appeal'. State v. Messerly, 126 Mont. 62, 69, 244 Pac. (2d) 1054, 1057. See also, State v. Robinson, 109 Mont. 322, 96 Pac. (2d) 265; State v. Harkins, 85 Mont. 585, 281 Pac. 551, and cases therein cited."

There is substantial evidence in the record to support the verdict, and accordingly the judgment of conviction and the order denying the appellant a new trial is affirmed.

MR. JUSTICES CASTLES, ANGSTMAN, BOTTOMLY and ADAIR, concur.