STATE, Respondent, *v.* HARKINS, Appellant.

(No. 6,501.)

(Submitted September 26, 1929. Decided October 19, 1929.)

[281 Pac. 551.]

586

*Mr. George W. Farr* and *Mr. C. J. Dousman,* for Appellant, submitted a brief; *Mr. Dousman* argued the cause orally.

588

*Mr. L. A. Foot*, Attorney General, *Mr. Stanley R. Foot*, Assistant Attorney General, *Mr. Raymond Shelden* and *Mr. Rudolph Nelstead*, of Counsel for the State, submitted a brief; *Mr. Nelstead* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal by the defendant from a judgment convicting him of manslaughter and from an order denying him a new trial.

I. At the outset counsel for the state argue that we cannot consider the appeal from the order denying defendant's motion for a new trial because before the order was entered an appeal from the judgment had been perfected; therefore, it is said, the lower court was without jurisdiction to pass upon the motion and we have no right to consider the defendant's appeal therefrom. We do not agree with this position. The right to appeal from an order denying a motion for a new trial in a criminal action is expressly granted by section 12107, Revised Codes of 1921. This section must be read with reference to its companions. Section 12116 provides that upon the appeal being taken the clerk with whom the notice of appeal is filed must, within ten days thereafter, in case the bill of exceptions has been settled by the judge before the giving of said notice, but if not, then within ten days from the settle-

ment of the bill of exceptions, transmit to the clerk of the appellate court the record on appeal,—showing conclusively that the judge has authority to settle a bill of exceptions after the appeal is taken. He could not do that if the position of counsel for the state is sound.

It has been a common practice for a defendant desiring to be admitted to bail pending an appeal to the supreme court to obtain his release from custody upon a certificate of probable cause, followed by the giving of a bond (as prescribed by section 12138), and this course has been followed where the motion for a new trial is still pending in the trial court. The practice is proper. Otherwise upon the entry of judgment, one desiring to move for a new trial must needs lie in jail awaiting the court's ruling upon the motion—he dare not appeal to the supreme court, for that would deprive the trial court of the power to rule.

"An appeal to the supreme court from a judgment of conviction, stays the execution of the judgment in all capital cases, and in all other cases upon filing with the clerk of the court in which the conviction was had, a certificate of the judge of such court, or of a justice of the supreme court, that in his opinion, there is probable cause for the appeal, but not otherwise." (Sec. 12113, Rev. Codes 1921.) "After conviction of an offense not punishable with death a defendant who has appealed may be admitted to bail.—1. As a matter of right, when the appeal is from a judgment imposing a fine only. 2. As a matter of discretion in all other cases." (Sec. 12137.)

These statutes recognize the benevolent provisions of the Constitution that "all persons shall be bailable by sufficient sureties except for capital offenses, when the proof is evident or the presumption great," and "excessive bail shall not be required" (secs. 19 and 20, Art. III), and declare that even after conviction, pending appeal, a prisoner, within the restrictions imposed by sound judicial discretion, may have his liberty upon giving sufficient bail.

Moreover, we think the holding in *Molt* v. *Northern Pac. Ry. Co.*, 44 Mont. 471, 120 Pac. 809, 810, followed in *Murphy* v. *Nett*, 47 Mont. 38, 130 Pac. 451, is applicable to the present case. "In case of appeal from a judgment the lower court loses jurisdiction over the judgment, but it still retains jurisdiction over the motion for a new trial, with power to rule thereon. Proceedings on motion for a new trial are independent of the judgment, and, in a sense collateral thereto." (And see *Hoppin* v. *Lang*, 74 Mont. 558, 241 Pac. 636.) Any other interpretation of the statute would, in some cases, deprive the defendant of the statutory right of appeal.

II. The defendant admits that he killed John Jolly on the 27th of July, 1928, but claims he did so in self-defense. The parties lived near Chalk Buttes in Carter county, about thirty miles southerly from Ekalaka. Their residences were about a mile and a half apart and each lived upon lands owned by himself. The defendant had resided in the locality fourteen years and Jolly about three years. Between the lands of the parties there was a half-section of land owned by one Ripley, which was not leased by either party. The relations between the defendant and Jolly, first friendly, became unfriendly. In 1927 the defendant had caused Jolly to be prosecuted for stealing a heifer. Jolly was acquitted, but after the trial paid for the animal. Angered because of his arrest he made threats against the defendant, some of which were communicated to the latter. The testimony shows clearly that Jolly was a man of great strength, and of violent temper. When in anger he appeared almost insane. He bore the reputation of being a quarrelsome, violent and dangerous man. All of this was known to defendant. At least four persons, one of whom was a deputy sheriff living in an adjoining county, warned defendant that his life was in danger from Jolly. The defendant was 58 years old and weighed about 145 pounds. He testified that he never was very strong. Jolly, on the other hand, weighed 170 or 175 pounds. According to defendant's testimony, while he and Jolly were on good terms Jolly boasted of numerous physical encounters in which he had been engaged

and said he had never encountered a man who had got the better of him. He said to defendant, "Any man that crosses my trail or fools with my business is fooling with fire." In talking with defendant, Jolly said he left the Powder River country because of the enmity of Charley Miles, and that some day he would meet Miles alone and he would "beat the old son-of-a-bitch to death." Jolly threatened the life of Amos Harkins, a son of the defendant, on two occasions, and for fear of Jolly the boy left home because he did not feel safe in remaining there with Jolly as a near neighbor. These facts were communicated by the boy to his father. After the trouble over the heifer Jolly told defendant to keep off the Jolly place and defendant gave Jolly a like warning to keep off the Harkins' place. Defendant testified that after the termination of the case over the heifer, "I took precautions to protect myself. I did not stay alone after that as I was afraid to stay by myself. I got a hired man to stay with me and I continued to keep someone with me right after that for that specific purpose because I was afraid that some violence would be done me by the deceased." (Mrs. Harkins had left defendant in 1927 because Harkins was drinking moonshine whisky furnished by Jolly; but she was at home at the time of the tragedy.) The defendant's general reputation as a quiet and peaceable citizen was good.

A witness testified that about Christmas of 1927 he had a conversation with defendant, no one else being present. The witness said: "We were talking about Mr. Jolly. Of course, he said he did not like Jolly and he said, 'If it wasn't for the law back of it he would shoot him like a snake.'"

Trenk, a witness for the state, testified that about the month of December, 1927, at the Chalk Buttes postoffice, he was present when the defendant changed a tire on his car. He helped defendant part of the time, and in changing the tire witness noticed an automatic pistol on the car seat. At that time and place in the conversation there, said Trenk, in the presence of Ralph Hope and himself, defendant made the statement that he "intended to get Mr. Jolly."

In July, 1928, Jolly was caring for some 600 head of sheep which occasionally strayed upon the land of the defendant. On the morning of July 27, when Mrs. Jolly arose, she noticed that the sheep were absent from their bedding-ground and told her son Clarence, nine years old, to go after them. Shortly thereafter she told her husband that the sheep were gone. He arose, dressed himself hastily, and left the house. He was bareheaded and unarmed. There was a pocket knife in his "right hand front pocket," a witness said. On that morning defendant got up early and went in his car to borrow a piece of machinery from a neighbor. While returning he observed Jolly's sheep in his, Harkins' inclosure, and started to drive them out. Clarence, in pursuit of the sheep, saw his father who waved to him and said the sheep were "up there." Clarence passed out of sight of his father and did not see him again until he saw him and defendant within five feet of one another, and saw defendant shoot his father. Clarence was then 113 steps from the two men. He said he did not hear any words between them whatever before the shooting. Before or during the shots he saw his father raise his hand. "He also stepped backwards—west, away from Harkins. Harkins was facing west at that time and my father was facing east." His father fell, Clarence said, with his head to the west and his feet to the east. Testifying before the coroner's jury the boy said he heard but one shot fired, but at the trial he said he heard two. When he saw his father fall the boy ran away from the scene.

The defendant testified that when he first saw Jolly the distance between them was about sixty yards; that Jolly and he continued to walk toward each other until they got within a distance of perhaps thirty-five or forty yards, when the defendant said, mildly, "When did you lease this place, Jolly?" to which Jolly said, not showing any anger, "They got over on you a little, did they?" to which defendant replied, "Yes, and they have been on me before." Quick as a flash, said defendant, Jolly began to curse him violently and to run toward him saying finally, "I will cut your God damn

heart out." Jolly "kept getting higher with his voice," testified defendant, "and he started for his knife. When he started for his knife I started for the gun. He was coming all the time. I says, 'stop,' and he run right to me and he run as hard as he could run until he fell right in front of me. * * * He did not stop at my summons before I pulled the trigger. I suppose he came within ten or twelve feet, or eight or ten, something like that, of me, in my best judgment, before I discharged the gun. Then I certainly pulled the trigger. I must have pulled it more than once but I do not know how many times I discharged it nor how rapidly I fired it. I did not fire it after he was on the ground. I believed my life was in danger."

On cross-examination the defendant reiterated that he and Jolly were thirty-five or forty yards apart when they commenced their conversation, but that when Jolly began to curse he started to walk fast and when defendant said "stop," Jolly ran as hard as he could. Defendant said, "I did not know whether he got a knife or not—I did not look for no knife. I asked him to stop and he just kept coming. By the time he got 'you're a God damn liar' said, he was probably about 20 yards from me. I was standing there and I stood there. He ran towards me and I shot him."

Again defendant said Jolly was probably 100 feet away when he first started reaching for his knife. "He didn't try to get his knife out. I guess he didn't try any more. I didn't see the deceased take his knife out of his pocket. I don't know if he had taken it out or not. I would think John Jolly was anywhere from eight to fifteen feet or something like that when I shot him." Defendant testified that after Jolly fell he walked away and started to put the gun back in the holster when he discharged it accidentally.

Defendant's automatic 38-caliber pistol holds one cartridge in the barrel and seven in the clip. When it was turned over to the sheriff it had one cartridge in the barrel and one in the clip. Thus, if the gun was fully loaded the defendant had fired six shots. The body was lying upon its back, the head

toward the west, or in a westerly direction. Four shells were found, within a radius of two or three feet, nine feet from the body in a northwesterly direction, and another twenty-seven feet from the body in a northerly direction, a little east of north. But five shells were found. After the shooting defendant returned to his home, where, seeing Cook, his hired man, he said, "Ed, I killed him." Asked whom he had killed he said, "I killed Jolly." Relating this conversation, Cook testified defendant said he thought Jolly "had a knife or some kind of a weapon, and he killed him in self-defense." After telling Cook what had occurred, defendant told him to go to the body and see that it was not molested until the officers arrived. Defendant told his boy Otis, fifteen years old, after the boy had returned from the field, to go to Mrs. Jolly's and tell her that Jolly was up on the hill, shot.

The defendant then started to Ekalaka to surrender himself. On the way he met two men whom he told of the shooting. One of the men understood the defendant to say that when he shot, Jolly was coming toward him with a knife but the other man sitting in the same vehicle did not remember any such assertion.

Otis had been sent out in the field to get some horses. He testified that when he was distant 1,235 steps, as the sheriff found the distance to be, from the scene of the killing, he heard voices, upon which he ran out upon the hill so that he could see what was going on, and that he observed Jolly running toward his father and heard Jolly say, "I'll cut your God damn heart out," and that he observed the shooting. He thought three shots were fired. "The shots were real quick together. I guess Jolly was closer to my father when the second shot was fired; he kept running." In a statement made under oath to the county attorney on the evening of the shooting the witness had said he judged Jolly was forty feet from his father when the first shot was fired and about thirty when the second shot was fired. In some particulars the statement made to the county attorney differed from his testimony at the trial. He denied that he had stated to Cyril VanHook

that Jolly had run at defendant with a knife in his hand. Cyril VanHook testified that Otis did make that statement.

The coroner with a jury viewed the body where it fell on the morning of the shooting. Dr. B. B. Sandy, a practicing physician, was present and examined the body, which was then taken to the county seat. The county attorney requested Dr. Sandy to perform an autopsy but he was unable to do so because of other urgent duties. The county attorney then requested Mr. E. J. Sipes to perform the autopsy and he did so, with the aid of an undertaker.

Thereafter the county attorney informed against the defendant charging him with murder in the first degree.

Five errors are assigned.

1. The first is to the effect that the court erred in permitting the witness Sipes to express opinions based upon his autopsy. Mr. Sipes is a minister of the gospel. He testified that he had studied medicine for a period of fully thirty years on the theoretical side, and gave the names of a considerable number of authoritative books on medicine and surgery which he has in his library. He said that during the thirty-year period of which he had spoken he had made use of practically every opportunity to visit hospitals; had attended medical lectures; had frequented dissecting-rooms in several medical schools and had witnessed operations in various hospitals in many places in the United States. He had been present when surgeons consulted as to methods of operation and their effects on the body, and had studied the human body as the surgeons operated. He gave the names of several distinguished surgeons at whose feet he had sat. He had resided in Ekalaka seven years and since his arrival there had "practiced medicine in practically all its phases. * * * I am able to determine the course of bullet wounds and their effect upon the human body. I have seen many human bodies dissected in medical laboratories and understand where the main vital organs of the body are located, and can tell and define their positions in the human body. I know the general course and character of the main arteries and veins of the body

and am acquainted in a general way with the main or chief nervous systems of the body." He was then permitted without objection to testify that he performed an autopsy upon the body of the deceased. He found seven gun-shot wounds, six on the body, and one on the left arm, of the deceased, and described with great particularity the courses of the bullets as disclosed by the autopsy. For instance, he described the one entering at the top of the hip bone as taking a course through the body, naming the organs affected in passage, and lodging in the right side of the backbone; "I located that bullet on the top of the fourth lumbar vertebra." After describing a wound in deceased's neck the witness said: "The carotid artery and the vagus nerve were the primary organs that were severed or injured by the bullet that entered the neck in front. The vagus nerve is the principal nerve controlling the heart." The injury to the vagus nerve would destroy the functions of the heart, he explained, "the heart would stop beating and cease to function." All this went in without objection.

A little later the witness was asked to state the effect of a bullet wound in the neck. Objection was made "upon the ground that the witness is not qualified to answer and entirely incompetent." The objection was overruled, and the witness answered. The witness was also asked whether it was possible for one bullet to have made the wound entering at the top of the right hip bone and the other wound five inches below the navel and one inch to the right of the median line, to which objection was made "that there is not any sufficient foundation laid, purely speculative, and calling for an opinion and conclusion of the witness which he has not shown himself competent to give." The objection was overruled and the witness answered in the negative.

The court's ruling upon the first question to which objection was made could be sustained because the witness practically had answered the question by previous testimony without objection; but the second fairly presents the point upon which counsel for the defendant rely as one ground for the re-

versal of the judgment. They say Mr. Sipes did not have authority to perform the autopsy as he was not requested by the coroner to do so, and he had not been licensed to practice medicine and surgery in this state. They cite section 12383, Revised Codes of 1921, as bearing on the point. Whether or not witness had authority to perform the autopsy, the rule is that competent evidence should not be excluded simply because it has been obtained in irregular manner. But counsel's main contention on this phase of the case is that Mr. Sipes was not qualified to testify as an expert for the reason that he is not a graduate of a medical school nor has he been licensed to practice in this state. Neither of these qualifications is necessary. (22 C. J. 676.) The question in such case is whether the witness who is called upon has the necessary experiential qualifications, no matter how he has come by them. "That sort of capacity which involves, not the organic powers, moral and mental, requisite for all testimony nor yet the emotional power of unbiased observation and statement, but the *skill to acquire accurate conceptions,* may be termed Experiential Capacity. The person possessing it is commonly called Expert." (Wigmore on Evidence, 2d ed., sec. 555.) The general rule is that the fact of possession of the required qualifications by a particular witness should be left to the determination of the trial court and its decision thereon will not be reversed unless manifestly erroneous as a matter of law. (*Inland & Seaboard Coasting Co.* v. *Tolson,* 139 U. S. 555, 35 L. Ed. 270, 11 Sup. Ct. Rep. 653; *Stillwell etc. Mfg. Co.* v. *Phelps,* 130 U. S. 520, 32 L. Ed. 1035, 9 Sup. Ct. Rep. 601; *Union Pacific Ry. Co.* v. *Novak,* 61 Fed. 573, 9 C. C. A. 629; *Nunes* v. *Perry,* 113 Mass. 274; *Perkins* v. *Stickney,* 132 Mass. 217.) Under this rule we cannot say that the trial court erred in permitting the witness to answer the questions propounded.

2. It is argued that the court erred in permitting the ▇▇▇ witness Trenk to testify for the reason that his name was not indorsed on the information. The county attorney did not know that Trenk would be a witness when the information was filed. It appears that that officer made application to

indorse Trenk's name upon the information at the beginning of the trial. The court properly granted the request. (*State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364, 366; *State* v. *Calder,* 23 Mont. 504, 59 Pac. 903; *State* v. *Schnepel,* 23 Mont. 523, 59 Pac. 927; *State* v. *McDonald,* 51 Mont. 1, 149 Pac. 279, 281; *State* v. *Gaimos,* 53 Mont. 118, 162 Pac. 596, 597.)

The statute, section 11085, Revised Codes of 1921, requires the county attorney to indorse upon the information, at the time of filing it, the names of all witnesses for the state known to him. Commenting on this section this court, speaking through Mr. Chief Justice Brantley, said in *State* v. *Sloan,* supra: "But nowhere do we find any provision requiring the names of subsequently discovered witnesses to be so indorsed. It is, however, a safe and proper practice to have this done, so that the defendant may have no ground to complain that he has not had sufficient opportunity to meet the testimony of witnesses of whom he has received no notice." This we reaffirm, and suggest to the county attorneys that the practice indicated be followed. As was said by this court in *State* v. *Gaimos,* supra, "the defendant in all cases is entitled to know what persons will be called to testify against him and every reasonable opportunity he might desire to investigate them, or to prepare to meet their testimony, should be accorded to him."

In the case at bar the county attorney knew that Trenk, an important witness, would testify for the state as early as September 1, 1928. Court was in session on October 6, 1928, and at that time made an order setting the cause for trial. The county attorney might well have asked at that time to indorse the name of Trenk on the information. That in a given case the defendant may be able to show prejudicial error because the county attorney has concealed the names of material witnesses is intimated not only in the language quoted from *State* v. *Sloan,* supra, but in *State* v. *McDonald,* supra, where Judge Brantly again speaking for the court said that when the defendant's complaint is that he has not been accorded sufficient time for preparation, or that he has been surprised by the state's production of evidence, which he has not been allowed an opportunity to meet or controvert,

and he makes such a showing to the court as to justify the conclusion that his complaint is well founded, then, and then only, has he a right to allege prejudice." No such showing was made by the defendant in this case. Defendant denied the conversation and a number of witnesses for him testified that the general reputation of Trenk for truth, honesty and integrity was bad.

3. Error is predicated upon the action of the court in not permitting the defendant to show the character of deceased for violence by his threats and violent acts to other parties, and in particular in sustaining objections to questions asked the witness Pemberton. However, it does not appear that any of the threats or violent acts against other parties were known to the defendant. The court ruled correctly in sustaining the objections. (*State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035.) By reason of widely divergent facts, *State* v. *Caterni,* 54 Mont. 456, 171 Pac. 284, is not in point.

4. The next assignment of error is that the evidence is insufficient to justify the verdict. After a careful and laborious study of all of the evidence we are compelled to deny the validity of the assignment. The settled rule is that when there is a conflict in the evidence and there is substantial evidence to support the verdict, this court will not interfere. (*State* v. *Brodock,* 53 Mont. 463, 164 Pac. 658; *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270; *State* v. *Chavez, ante,* p. 544, 281 Pac. 352.) Here, too, it appears the verdict has received the approval of the trial judge.

Whether the circumstances attending the homicide were such as to justify the fears of the defendant as a reasonable person in the belief that he was in imminent danger of losing his life or suffering great bodily harm at the hands of Jolly, was a question of fact for the jury. (*Clay* v. *State,* 124 Ga. 795, 53 S. E. 179; see cases collected in note to *State* v. *Beckner,* 3 L. R. A. (n. s.) 547.)

There can be no doubt, in the light of the testimony, that the deceased was a quarrelsome, violent and dangerous man. Nor can there be any doubt that the defendant was afraid of him; there seems to be little doubt that the defendant antici-

pated a fatal encounter with him; and, contemplating this, we think the record justifies the inference that the defendant with fear in his heart was shooting-minded. The defendant was not justified in shooting Jolly simply because he feared him; the bare fear of an assault by Jolly was not enough. The defendant was justified in killing Jolly only if there was reasonable ground at the time of the shooting to apprehend that Jolly then intended to do him some great bodily injury and imminent danger of such design being accomplished, and the circumstances must have been sufficient to have excited the fears of a reasonable person, and the defendant in killing must have acted under the influence of such fears alone. (Sec. 10966; Rev. Codes 1921.)

The defendant, of course, was justified in acting upon appearances of danger—such appearances as would lead a reasonable person to believe he was in danger of great bodily harm. (*State* v. *Houk*, 34 Mont. 418, 87 Pac. 175.) All this was explained to the jury by instructions of which no complaint is made.

The jury may have disbelieved the defendant's account of the facts and circumstances surrounding the tragedy. It may have believed in view of the situation of the body and the position of the shells with relation thereto that the defendant's story was false. It may have believed that the defendant, instead of firing five shots at Jolly, fired six shots at him and that his explanation that he shot the gun accidentally at the point twenty-seven feet away from the body was false.

Mr. Sipes testified that the wounds upon Jolly's body necessarily were made by six bullets, and Dr. Sandy finally came to that conclusion although he had expressed the opinion that possibly they might have been made by five. The jury may have disbelieved that Jolly was running toward the defendant when the fatal shots were fired; on the contrary, it may have believed that Jolly was retreating from the defendant, who was the aggressor. The testimony of Clarence gives substance to that claim.

Veterans of the World War who had seen men shot in battle testified that a man shot with a rifle bullet while walking or

running forward invariably falls forward, and while stepping backward will fall backward. A physician, qualified to speak, gave similar testimony. Witnesses for the defendant created some conflict on this feature of the case. The jury may have doubted whether Jolly had threatened to cut out defendant's heart, and the story of Otis that he heard the threat when he was 1235 steps away. Clarence, 113 steps away, said he did not hear any talk between his father and defendant. There are other bits of testimony in the record which may have led the jury to disbelieve defendant as well as Otis.

(As explanatory of the testimony of the witnesses who heard the shooting it is pertinent to say experts testified that six shots can be fired from defendant's pistol in approximately two seconds, and when the pistol is fired with that rapidity it is not possible to distinguish the shots,—one cannot count them.)

A witness false in one part of his testimony is to be distrusted in others. The credibility of the witnesses is exclusively for the jury.

We cannot say that there is no conflict in the evidence on vital points, nor that the evidence is insufficient to justify the verdict. We have arrived at this conclusion with many misgivings. To us, out of the hearing and presence of the witnesses, it appears that the jury might well have reached a different result. But we are not the triers of fact and may not invade the jury's province.

5. The last assignment of error is based upon newly discovered evidence. But upon examination it is found to be of a cumulative nature, or of an impeaching character, or else a want of diligence is shown. We need only cite as determinative, *State* v. *Matkins,* 45 Mont. 58, 121 Pac. 881, and *State* v. *Van Laningham,* 55 Mont. 17, 173 Pac. 795.

The order denying a new trial and the judgment are affirmed.

ASSOCIATE JUSTICES MATTHEWS, GALEN, FORD and ANGSTMAN concur.

Rehearing denied October 30, 1929.