STATE OF MONTANA, PLAINTIFF AND RESPONDENT *v.* CECIL
BUBNASH, DEFENDANT AND APPELLANT.

No. 10261

Submitted November 19, 1962. Decided May 27, 1963.

· 382 P.2d 830

378

William Conklin, Great Falls, for appellant.

Gene B. Daly, County Atty., John C. Hall, Deputy County Atty. (argued orally), Great Falls, Forrest H. Anderson, Atty. Gen., Alfred Coate and Carroll E. Multz, Deputy Attys' Gen. (argued orally), Helena, for respondent.

MR. JUSTICE ADAIR delivered the Opinion of the Court.

This is an appeal from a judgment of conviction of first degree burglary.

By information filed December 16, 1960, in the district court for Cascade County, Montana, Cecil Bubnash, was charged with the crime of burglary in the first degree committed in the nighttime on December 15, 1960, by breaking into and entering that certain building known as Crown Jewelry, located at No. 415 Central Avenue, in Great Falls, Montana, with intent to commit larceny therein. A prior conviction of felony, to-wit, burglary in the first degree committed in Cascade County, Montana, upon which judgment upon conviction pronounced and rendered on May 25, 1955, was also charged.

At his arraignment on January 11, 1961, the defendant Bubnash entered the plea of "Not Guilty" to both the charge of burglary in the first degree alleged to have been committed on December 15, 1960, and "Not Guilty" to the charge of a

prior conviction of a felony wherein judgment upon said conviction was alleged to have been pronounced and rendered on May 25, 1955.

On February 20, 1961, the instant cause came regularly on for trial in the District Court for Cascade County, sitting with a jury and, at the commencement of such trial, the defendant Bubnash withdrew his earlier plea of "Not Guilty" to the charge of a prior conviction of a felony and thereupon admitted the prior conviction.

In its verdict in the instant cause, the jury, on February 24, 1961, found the defendant Bubnash guilty of the crime of burglary in the first degree as charged in the information and fixed his punishment at imprisonment in the state prison for a period of ten years. From the judgment entered on such verdict the defendant appeals.

At the conclusion of the State's case in chief, the defendant's counsel orally moved that the action be dismissed on the grounds "that the State has wholly failed to prove material allegations of the Information" and that the State has "not sufficiently carried the burden of proving beyond a reasonable doubt the guilt of this defendant."

In ruling upon defendant's above motion to dismiss, the trial judge said: "I think there is sufficient evidence in this case so far to carry the case to the jury. Your motion will be overruled."

*Specifications No. 1 and 2.* The refusal of the trial court to dismiss the charge of burglary in the first degree at the end of the State's case in chief is assigned by defendant as his first specification of error.

Next, and for his second specification of error, the defendant asserts that the evidence, viewed as a whole, is not sufficient to sustain the verdict and judgment.

We find no merit in either of the above specifications.

The record before us on this appeal discloses that on its case in chief and as proof to establish and sustain the charges

made in the information, the State of Montana produced the oral testimony of fifteen apparently credible witnesses and also introduced for the inspection of the jury and the trial court some eighteen marked exhibits.

*The evidence.* At the trial the State's witnesses testified as is stated below.

*John G. Vail.* The witness John G. Vail testified: In the evening of December 14 and on the early morning of December 15 in the year 1960, he was employed as a musician at the Club Cimarron in Black Eagle, Montana.

At approximately 10:30 P. M. to 10:45 P. M. on the night of December 14, 1960, he, the witness Vail, stepped off the bandstand at the Club Cimarron and took a sort of break or brief rest during which time he had a conversation in the Club with the defendant Cecil Bubnash whom Vail had known for approximately ten years.

Vail testified at that time "there was a club full of people * * * I got off the bandstand. He [Bubnash] says: 'Loan me your automobile. I'm going to run up to the Ranger's Club for a few minutes * * *' I gave him the keys to the car. * * * I went to the back room, and that was all there was to it."

Vail testified that at the time he loaned his car to Cecil Bubnash there was a dent right at or in the tail light on the right side as you would face forward in the car which dent had been sustained sometime previous in Browning, Montana.

When asked to describe the automobile he had loaned to Bubnash on December 14, 1960, Vail testified: "Well, it was a '59 Chevrolet, blue and white in color is about all I can tell you."

When shown the State's Exhibit No. 4, being a photograph taken by the State's witness Andrew DeMier of the DeMier Studio in Great Falls, on December 15, 1960, of a 1959 Chevrolet automobile bearing 1960 Montana license plates No. 48-1017, and when asked if he could recognize such automobile

the witness Vail replied: "Well from the license number that is my automobile."

The witness Vail also testified that at the time he loaned his automobile to Bubnash there was one hammer in the car that he knew of and that "there possibly could have been two."

Vail also was interrogated and he made answer as follows:

"Q. When was the next time you saw the automobile Mr. Vail? A. Down at the Police Station.

"Q. Do you recall the date? A. Well, it was the next day after I loaned the automobile.

"Q. That would be the fifteenth then? A. Yes."

*Sergeant Thompson.* The witness Charles Thompson testified: He was a sergeant of police in the City of Great Falls, Montana, and went on duty at the police station at 10:00 P.M. on December 14, 1960, remaining on duty there until 6:00 A. M. on the morning of December 15, 1960, during which time he was the dispatcher in charge and engaged in receiving telephone calls and in dispatching cars.

Sergeant Thompson testified that on the morning of December 15, 1960: "At about 1:29 A.M., the burglar alarm rang in the station on the box, the red light showed, and the alarm rang for the Crown Jewelry. * * * I then dispatched three cars to the Crown Jewelry on Central Avenue, Lieutenant Ballard and Detective Wutzke and Officer Chapman. * * * At about that time the telephone rang and I answered the telephone. * * * A man giving the name of Dick Tabor reported that he had been in the lobby of the Johnson Hotel and heard glass crash, and then had run out. He observed a car leaving from the position about in front of the Crown Jewelry and he noticed that the window was broken at the Crown Jewelry. * * * I then dispatched all other cars to various outlying parts of the city, informed all cars that I had received a call, giving them a description of the car I received from Mr. Tabor. * * * He reported that it was a 1959 Chevrolet, four-door sedan. It had a white top and a blue bot-

tom. * * * I received some inquiries from several of the officers about the automobile. They observed the '59 Chevrolets that were blue and white or all blue and wondered if a mistake could have been made so I called Mr. Tabor at the Johnson and confirmed it was the make and color that he had given me. He was positive about it. I then relayed that information to the cars. I then called the owner and manager of Crown Jewelry and asked him to come down to the Jewelry store. * * * I believe approximately three or four, five minutes after receiving the burglar alarm and the call from Mr. Tabor, I notified the Sheriff's Office and the Highway Patrol in sequence. * * * I think the burglar alarm rang about 1:29. About 1:30 the call came in. It must have been about—at most 1:35, 1:36."

*Richard J. Tabor.* The witness, Richard James Tabor, testified:

On December 15, 1960, he was the night clerk in the employ of the Johnson Hotel in Great Falls. His hours of work commenced at 11:00 P.M. on December 14, 1960, and ended at 7:00 A.M. on December 15, 1960. At about 1:30 A.M. on December 15, 1960, he was in the front part of the hotel when he heard a crash, whereupon, he ran out of the door of the Johnson Hotel to ascertain what was the matter, at which time he discovered the window of the Crown Jewelry had been broken and he then saw a blue and white, four-door '59 Chevrolet automobile drive away from the scene.

Tabor testified: "The car was heading west, turning north. * * * I ran to the phone and called the police station, sir." Tabor testified that he did not see who was in the car.

While on the witness stand the witness Tabor was shown the State's proposed Exhibits 4 and 5, being photographs of Vail's '59 Chevrolet, taken by the State's witness Andrew De-Mier, and Tabor was then asked: "Does this look like that car you saw?" To which Tabor answered: "Yes, it is."

*Richard Zaharko.* The witness Richard Zaharko, a Montana

Highway Patrolman, testified: At about 1:30 A.M. on December 15, 1960, he was proceeding in his automobile from Black Eagle toward Great Falls traveling on the River Road toward Sixth Street North in Great Falls. As he approached what is known as the Ninth Street underpass he met an automobile whose driver failed to dim his lights until Zaharko had given him the dimmer switch three times. At that time Zaharko observed that the only occupants of this automobile were two men, both of whom were riding in the front seat. The automobile had noticeably loud exhaust pipes and Zaharko noted there was a hole in the lens of the right tail light. After so meeting such automobile, Patrolman Zaharko proceeded directly to the Cascade County jail in Great Falls where he arrived at approximately 1:30 A.M. being about the time the report of the burglary of the Crown Jewelry Store was received from Police Sergeant Thompson, the dispatcher at the city police station. When asked as to the length of time he remained at the county jail Patrolman Zaharko testified: "I no more than got to the door and opened it and the report came in, and I turned and went back out. * * * I retracked the same way I come back in, right back over to Ninth Street." He testified that he was then on the lookout for the automobile observed at the scene of the break-in.

*Osborne and Stoner.* The witnesses Glen Osborne and Walter Donald Stoner were deputy sheriffs of Cascade County. They testified that at approximately 1:35 A.M. on December 15, 1960, and for some time thereafter they were on regular patrol duty in Black Eagle, riding together in an automobile being driven by Osborne.

Osborne testified that there was no radio in his car so that he and Stoner were required to resort to public telephones to keep in contact with the county jail; that some minutes before 1:45 A.M. Osborne and Stoner parked their car near Earl's Bar located on Fifteenth Street and Montana Avenue in Black Eagle, from where they telephoned the Cascade

County jail and informed Deputy Sheriff Charles Simenson the dispatcher then on duty, that they were just checking to ascertain if anything was taking place whereupon Deputy Simenson informed them of the break-in at the Crown Jewelry store and directed them to watch the road and keep a lookout for the described 1959 blue and white Chevrolet automobile.

Osborne and Stoner immediately returned to their automobile which they had parked on Fifteenth Street headed south. At approximately 1:45 A.M. on December 15, 1960, as they proceeded south on Fifteenth Street the two deputies observed an automobile approaching from the south which automobile met and passed the officers' car at which time the officers saw that there were only two persons riding in the passing car and that such car met the description just given them by Deputy Simenson, whereupon Osborne wheeled his automobile around and proceeded to follow the '59 blue and white Chevrolet which eventually headed toward and was driven upon the north approach of the bridge that spans the Missouri River between Black Eagle to the north and Great Falls to the south which bridge was referred to by some of the witnesses as the Ninth Street Bridge and by other witnesses as the Tenth Street Bridge.

Osborne testified that when the Chevrolet, proceeding in a southerly direction, was on the north approach and had reached a point approximately one-third of the way across the bridge that he "observed its brake lights go on * * * and then a car door open * * * And as we got ourselves turned around and pursued the car again, the car started off from a stop and continued to the end of the bridge, that would be the south end of the Tenth Street Bridge * * * It would have been just about north of center, about one-third of the way across the bridge. From the north side, approximately one-third of the way across the bridge."

Osborne testified that the Chevrolet then proceeded across

the bridge and when it reached the opposite end, being the south end of the bridge, Police Officer Earl J. Lander, Jr., had driven his car into the parking lot of "Monty's Cafe" which is located at the intersection at the extreme south end of the bridge at which place the driver of the '59 Chevrolet "attempted to make a U turn to go back the way he had come, and as he attempted this U turn" Deputies Osborne and Stoner pulled up on him preventing him completing the turn.

Osborne testified: "There were two persons in the automobile. One of whom we readily recognized as the defendant." Osborne further testified that at that time the defendant Bubnash was driving; that both Osborne and Deputy Stoner got out of their car and talked to the defendant Bubnash and that Deputy Stoner then walked across the intersection to where Police Officer Lander was parked; that Deputy Stoner then returned accompanied by Officer Lander, whereupon Stoner, Osborne and Lander got the two occupants out of the '59 Chevrolet and gave each a weapons search.

Osborne testified that when the two occupants left the '59 Chevrolet he recognized that the driver of the car was the defendant Cecil Bubnash and his traveling companion was Lyle Peters with both of whom Officer Osborne had been acquainted for some time prior to that date.

*Earl J. Lander, Jr.* The witness Earl J. Lander, Jr., testified: That at the times here involved he was a patrol officer of the City of Great Falls; that at about 1:30 A.M. on December 15, 1960, he received an all-cars bulletin call that a burglary alarm had sounded at the Crown Jewelry, and he was dispatched to the north entrance to the City of Great Falls which is Ninth Street and River Road where he was to be on the lookout for a 1959 blue and white Chevrolet automobile. Lander thereupon proceeded to a visual point on the Great Northern overpass on the north River Road overpass where visibility was good for all surrounding areas. Lander had with him a pair of 7 x 35 binoculars. Some minutes after he had

taken his above-position, he observed through his binoculars an automobile fitting the description of the one sought, which was approaching from the north and headed south.

Lander testified: "The car proceeded south onto the bridge, and stopped after it had gone onto the bridge approximately, I would say, about a third of the way across the bridge it stopped. * * * And a person got out of the driver's side of the vehicle, and approached around the front of the car to the other side of the vehicle. * * * The car then approached— started south again, and at the time I radioed the station and told them there was a car approaching that fitted the description of the vehicle, and I was going to stop it on the south end of the bridge. * * * At that time I noticed as the car approached the south end of the bridge there was another vehicle coming in from the rear of it * * * the vehicle * * * a 1959 Chevrolet came to the * * * kind of an intersection at the end of the bridge on Ninth Street and started making a U turn. At that time it stopped, as I was across the street, and the other vehicle approached from the rear. And all the vehicles came to a stop. * * * I was still radioing at that time * * * The other car stopped behind, it was a 1960 Ford, which happened to be a Deputy Sheriff * * * Don Stoner walked over to me, identified himself and said * * * he wanted to know if that car fitted the description of the one we wanted and I said: 'Yes, it did.' He said Cecil Bubnash was driving the car, and at that time I radioed the station and informed them that Bubnash had been driving the car. I walked with Deputy Stoner over to the vehicle." It was "about 1:48 A.M., I believe."

When asked if he was able to identify the two men in the car, the witness Lander testified: "I only recognized one of them. That was the driver who was Cecil Bubnash. * * * At that time we had both Mr. Bubnash and the other occupant get out of the car, and we frisked them for any weapons they might have on them. * * * At that time I instructed

them to come across the road with us to my car * * * which was on the east side of the intersection. * * * So we could keep an eye on them and I radioed the station for one of our detectives to come over."

Lander testified: "At that time I told Deputy Stoner of the car stopping on the bridge, and we decided to go back * * * and see what was on the bridge, what was the reason for stopping. * * * Deputy Stoner walked on foot and I drove the car. I checked the right-hand side of the bridge for anything there and Deputy Stoner went on the left side walking and he found a * * * ring box laying on the bridge, on the sidewalk there." The witness Lander identified the State's Exhibit No. 3 as being the ring display box that Deputy Sheriff Stoner found on the bridge at a spot approximately one-third of the way south of the north end of the bridge being approximately the identical place at which the witness Lander had observed the '59 Chevrolet stop.

Officer Lander was able to describe the coat or jacket worn by the driver of the '59 Chevrolet at the time it made its first stop on the north end of the bridge. It was a gray jacket that the defendant Bubnash was wearing when he and Lyle Peters were stopped by the officers at the south end of the bridge at approximately 1:50 A.M. on December 15, 1960.

Officer Lander testified: "I asked the defendant [Bubnash] I asked him what he had stopped on the bridge for and got out of the vehicle. He said he had got out of the vehicle to check the tires."

Deputy Sheriff Stoner testified that he had asked the defendant Bubnash why he had made his initial stop on the north end of the bridge and the defendant, Bubnash pointing to his companion Lyle Peters, said: "He had to take a leak."

*Edwin Wutzke.* The witness Edwin Wutzke testified: At about 1:30 A.M. on the morning of December 15, 1960, while on duty as a detective in the Great Falls Police Department, and in response to the burglar alarm sounded for the Crown

Jewelry story which has a box in the police station, Detective Wutzke drove his car to the front of said jewelry store where he met Police Lieutenant Ballard who was already at the scene. Detective Wutzke observed that the front window of the store was broken, and that the window display was pretty well disturbed. These two officers then checked the area for evidence and searched for any articles that may have been taken or dropped from the window.

Detective Wutzke picked up a ring from the sidewalk and placed it on a display counter behind the glass in the store. The officers then checked the street and the gutters near the scene of the break-in for any other evidence that might be obtained. This done, Detective Wutzke, at the direction of Lieutenant Ballard, then drove to the south approach or end of the Ninth Street Bridge where he found a number of other peace officers who had in custody two suspects, namely, the defendant Cecil Bubnash and one Lyle Peters.

Wutzke testified: "I asked Mr. Bubnash at the time what his part was. * * * I asked him why he stopped on the bridge. He told me he had stopped to check the tires on the car. * * * he explained he got out of the car to check the tires. * * * After a short time I asked him if he would come with me and Mr. Peters to the police station which he agreed."

Thereupon, the defendant Cecil Bubnash and his companion, Lyle Peters, entered the police car driven by Detective Wutzke and rode therein to the Great Falls police station where they arrived at about 2:20 A.M. on December 15, 1960.

Upon entering the police station, Cecil Bubnash was left at the booking desk in the custody of Police Sergeant Thompson, the dispatcher, and Police Officer Raymond Smith while Lyle Peters, in custody of Detective Wutzke, was taken upstairs to the detective office.

Sergeant Thompson and Officer Raymond Smith searched the defendant Bubnash at the booking desk and found two diamond rings in the inside lining in the lower portion and

on the right-hand side of the gray sport coat worn by the defendant Bubnash at the time he entered the station.

The two searching officers, in the presence of Bubnash, removed the two rings by loosening the stitches holding the lining to the coat at the bottom, at which time according to the testimony of Sergeant Thompson, the defendant Bubnash "stated he knew nothing about the rings; that he had obtained the coat from a friend of his that evening. * * * He stated that he did not know how they got there, but he obtained that coat from a friend of his."

While Cecil Bubnash was being searched at the booking desk in the police station by Sergeant Thompson and Officer Smith, his traveling companion, Lyle Peters, was upstairs in the detective room undergoing interrogation and search by Detective Wutzke and Lieutenant Robert Ballard.

At the trial of Bubnash his one and only witness was Lyle Peters.

Concerning his interrogation and search at the police station by Detective Wutzke, early on the morning of December 15, 1960, Lyle Peters, on his direct examination, testified:

"Well, we were taken in and booked. They took me upstairs. * * * Well, one of the detectives was interrogating me, at least trying to. * * * He asked me where I had been, and I told him in Black Eagle. He asked how I happened to be with Cecil, and I told him he was just giving me a ride over town. And he searched me once, and had me take off—I took all of my clothes off except my socks, and he had me put them back on, and some other detective came in and * * * And he started to take me away, and he hollered back and asked the other guy if he searched me and the guy says, 'Yah'. I even volunteered for myself. Says, 'Yah, I searched him but I wasn't very thorough about it.' So he took me back into the place and I stripped back down again. * * * I stripped down to my socks and he was shaking my clothes and feeling the hems of them and searching the pockets and everything

else, and I sat down in a chair and he grabbed a hold of one of my feet and put his hand underneath it, and he said * * * 'This looks like them here,' and he pulled my sock off and took three diamond rings out of it."

"Q. Handing you State's Exhibit Two, there are three diamond rings, are those the three diamond rings you had in your sock? A. Yes.

"Q. Now, after they found the three diamond rings in your sock—Which sock was that, by the way? A. Left.

"Q. After they found the diamond rings what took place next? A. Well, he says, 'You want to tell us about it?' I says, "no". And he took me over and he locked me up in the cell by myself all night * * *."

On his cross examination at the trial of Bubnash, Lyle Peters was interrogated and he made answer thus:

"Q. When did you put the rings in your sock? A. When we stopped on the south end of the Ninth Street Bridge, Cecil had no idea what was taking place, but I had a pretty good idea, and I took these other three rings out of my pocket and I had my leg cocked up like this [indicating] and I had a boot on, it was about—I guess about an eight inch top on it, it was a loose top, and I put the rings, I slid the rings into my stocking.

"Q. That is when you were stopped on the south side of the bridge? A. Yes.

"Q. And was that in the presence of Cecil Bubnash that you did this? A. He was in the car but he couldn't see it."

*Robert Ballard.* Lieutenant of Police Robert Ballard testified: At about 1:30 A.M. on December 15, 1960, in response to a call he proceeded to the Crown Jewelry store where he found the front display window had been broken, and it appeared some of the merchandise had been removed. Later that morning, at the police station, Lieutenant Ballard found on the person of Lyle Peters, and hidden at the bottom of a sock he was then wearing on his left foot, three diamond rings.

Thereupon Lieutenant Ballard immediately summoned Earl W. O'Neil, the manager of the Crown Jewelry store, who came to the police station at about 3:00 A.M. on the morning of the break-in, at which time he identified the three rings as being part of those taken from the Crown Jewelry store earlier that morning.

*Earl W. O'Neil.* Manager O'Neil was also shown the two rings that had been concealed in the lining of the gray jacket worn that morning by the defendant Bubnash. These two rings and the gray jacket were introduced in evidence at the trial of Bubnash as the State's Exhibits No. 1-A, No. 1-B and No. 13, the latter being the gray jacket. Exhibits No. 1-A and 1-B are the two rings found on the person of Bubnash.

At the trial of Bubnash, witness O'Neil testified that the State's Exhibit No. 1-A is a white gold five-stone diamond engagement ring and that Exhibit 1-B is a five-diamond wedding ring.

O'Neil testified that upon being notified by the police that the front window of his store had been broken he immediately went to the store and upon his arrival there he found the front or east window had a large hole knocked in it and that jewelry was missing. As soon as he closed the window and boarded it up he took an inventory which inventory was not completed until about 4:30 A.M. that morning at which time it was found that numerous rings were missing. At the trial, O'Neil testified that he felt certain that the five rings exhibited to him at the police station, being those taken from the persons of Bubnash and Peters after the break-in, are rings stolen from his store. He further testified: "There is one there that I personally set the stone in myself." He also testified that there is no other store in Northwestern Montana that handles those same rings.

When asked at the trial how many rings were taken from the Crown Jewelry store on the morning of December 15, 1960,

he answered: "There were eleven units missing the morning of the fifteenth."

Following the search of Bubnash, at the booking desk, which produced the two diamond rings found in the gray jacket worn by him, Bubnash was brought upstairs to the detective room where he talked with Detective Wutzke who testified: "Mr. Bubnash explained to me he would probably get ten years out of this, and that at that time, when he came out he would only be forty-four years old and he would show us what he could really do. He wanted to call his girl friend, which we allowed him. * * * I asked him where he had gotten the rings, and he said he bought them from a fellow for one hundred dollars, a quick deal. * * * He indicated he did not know the man he had bought them from. * * * He had just purchased them, and was on his way home to get the hundred dollars."

While at the close of the State's case in chief, the defendant made a motion for nonsuit which was promptly denied by the trial judge, yet at no time did the defendant interpose any motion for either a directed verdict or for a new trial. Under such circumstances the defendant is not entitled to raise on this appeal the question of the sufficiency of the evidence to sustain the jury's verdict and the district court's judgment herein. See: State v. Brantingham, 66 Mont. 1, at p. 8, 212 P. 499 at p. 501; State v. Smart, 81 Mont. 145, at p. 149, 262 P. 158 at p. 160, and State v. Gransberry, 140 Mont. 70, 367 P.2d 766.

In State v. Peschon, 131 Mont. 330, at p. 339, 310 P.2d 591 at p. 596, this court said:

"* * * It is for the jury and not the reviewing court to determine the credibility of a witness and the weight to be given his testimony. State v. Robinson, 109 Mont. 322, 96 P.2d 265; State v. Espelin, 106 Mont. 231, 76 P.2d 629; State v. Collett, 118 Mont. 473, 480, 167 P.2d 584.

"* * * This court on appeal in a criminal case is control-

led by the following rules: Disputed questions of fact and the credibility of witnesses will not be considered on appeal. Determination of such matters is within the province of the jury, and so long as there is substantial evidence to support the verdict, it cannot be disturbed on appeal. State v. Messerly, 126 Mont. 62, 69, 244 P.2d 1054. See also State v. Robinson, supra, State v. Harkins, 85 Mont. 585, 281 P. 551, and cases therein cited. See also State v. Strobel [130 Mont. 442], 304 P.2d 606. There was sufficient competent evidence, if believed by the jury, to justify the jury's verdict."

■ *Specification No. 3.* For his third specification of error the defendant complains of the admission of the testimony of Deputy Sheriff Stoner and Deputy Sheriff Osborne as to what each had said to the other and to other peace officers in the performance of their respective duties. We find no merit in such specification. Early in the trial and his cross-examination of Deputy Sheriff Osborne, defendant's counsel elicited almost identical information. Thus it appears that defendant's counsel first put in the record the very matter to which he later objected and of which he here complains.

In 31 C.J.S. Evidence § 200, at p. 941, it is said that, "it is considered that knowledge acquired in the line of official duty or employment is not objectionable as based on hearsay."

Here all the peace officers then on duty in Cascade County had been alerted and each knew that he was to be on the lookout for "a '59 Chevrolet, blue and white, four door" which the witness Richard Tabor reported he had observed being driven away from the scene of the break-in "heading west" then "turning north". The defendant's brief is silent as to any prejudice to him resulting from the admission of the testimony of which he complains in his third specification of error.

In State v. Straight, 136 Mont. 255 at pp. 264, 265, 347 P.2d 482, at p. 488, this court stated:

"Under section 94-8207, R.C.M.1947, prejudice in a criminal case will not be presumed, but rather must appear from the

denial or invasion of a substantial right from which the law imputes prejudice. State v. Hall, 55 Mont. 182, 175 P. 267. It is up to this court to decide whether an error affects the substantial rights of the defendant and the defendant must demonstrate prejudice from the record. State v. Byrd, 41 Mont. 585, 111 P. 407."

*Specification No. 4.* In his fourth specification of error the defendant complains of the action of the trial judge in allowing the county attorney to endorse on the information the names of nine additional witnesses but a couple of days before the commencement of defendant's trial, but here again defendant has failed to show prejudice resulting to him by reason of such action.

The record before us on this appeal clearly shows that the trial judge was agreeable to allowing defendant's counsel all the additional time that should be required to consult and examine these additional witnesses.

The record shows: That on Monday, February 20, 1961, at the hour of 9:30 A.M., the cause came on regularly for trial before the district judge sitting with the prospective jurors; that at the outset of the proceedings the trial judge asked the prospective jurors to leave the courtroom. This request for withdrawal was to enable the defendant Bubnash to withdraw his plea of "Not Guilty" of having suffered a prior conviction of a felony which plea he had entered on January 11, 1961, and to enter in its stead a plea of guilty of having suffered a prior conviction to a felony as charged in the information. The district judge granted the defendant's request, whereupon the following occurred:

"The Court. And to that charge of prior conviction of a Burglary in the First Degree on the 25th day of May, 1955, Mr. Bubnash, is that true or untrue?

"The Defendant: True.

"The Court: And that is your plea for that prior conviction.

"The Defendant: Yes, sir, I served time for that.

"The Court: Very well, let the record show that Cecil Bubnash has plead that that prior conviction is true."

Next, upon motion of the defendant's court appointed counsel, John H. Corcoran, Esq., the name of Robert T. Merrill, Esq., was ordered entered as one of defendant's counsel of record in the action.

Thereupon the following proceedings were had:

"The Court: Very well, will you call the jurors then?

(Whereupon the jurors returned to the courtroom at 9:45 A.M.)

"The Court: Cause No. 4997, State of Montana versus Cecil Bubnash, is set for jury trial today. Is the plaintiff ready for trial?

"Mr. Hilley: Ready, Your Honor.

"The Court: Is the defendant ready for trial?

"Mr. Corcoran: Ready for trial."

Next, after due examination and selection of the jurors by the respective counsel, the jury was sworn by the Clerk to try the case.

Thereupon the following occurred:

"The Court: You may proceed.

"Mr. Corcoran: The Court's Order signed by Your Honor, served on me Friday, we had no opportunity at all to look up these witnesses. This contains the names of nine additional witnesses. We would like some time in order to talk to them.

"The Court: You say it was served when, Mr. Corcoran?

"Mr. Corcoran: Well, it was signed sometime in the afternoon of Friday, the 17th. It was served on me late that day.

"The Court: If there is any question of time necessary, Mr. Corcoran, to examine or talk to these witnesses, the Court will furnish that time prior to proceeding. You may proceed."

The defendant has shown no prejudice in the above recited rulings and procedure. Defendant's counsel had three days in which to examine these witnesses. At no time did they ask for more. On the contrary when asked by the trial judge if

defendant was ready for trial defendant's counsel announced: "Ready for trial." See: State v. Lyford, 87 Mont. 325, 331, 287 P. 214, and State v. Phillips, 127 Mont. 381, at pp. 392, 394, 264 P.2d 1009, at pp. 1015, 1016.

Defendant's fourth specification is lacking in merit.

*Specification No. 5.* In his fifth specification of error the defendant complains of the giving of the court's somewhat lengthy Instruction No. 34 to the giving whereof the defendant's only objection in the trial court was that "It places a burden on the defendant of showing the facts, or purported facts, under which he might be required to make a statement. It's not the law."

On this appeal the defendant for the first time asserts that the giving of the above instruction was prejudicial "for the reason that there was no evidence in the case upon which such instruction could be predicated."

■ This court is precluded by a specific statute from considering the defendant's last-quoted objection not made in the trial court but advanced for the first time on the instant appeal to this court.

Section 94-7201, subd. 4, R.C.M.1947, in part, provides:

"* * * On such settlement of the instructions the respective counsel, or the parties, shall specify and state the particular ground on which the instruction is objected or excepted to, and it shall not be sufficient in stating the ground of such objection or exception to state generally that the instruction does not state the law, or is against law, but such ground of objection or exception shall specify particularly wherein the instruction is insufficient, or does not state the law, or what particular clause therein is objected to. * * *

"* * * no cause shall be reversed by the supreme court for any error in instructions which was not specifically pointed out and excepted to at the settlement of the instructions herein specified * * *."

■ Only objections made at the time of the settlement of

the instructions may be considered by this court on appeal. See State v. Bolton, 65 Mont. 74, 82-83, 212 P. 504; State v. McComas, 85 Mont. 428, 432, 278 P. 993; State v. Hay, 120 Mont. 573, 583-584, 194 P.2d 232.

We find no merit in defendant's fifth specification of error.

*Specification No. 6.* As his sixth specification of error the defendant assigns the giving by the trial court of its instruction No. 17-A over the defendant's objection contending that "there was not one shred of evidence in the record showing or tending to show any conspiracy or plan between the defendant and anyone else."

Instruction 17-A reads:

"You are instructed that if you find beyond a reasonable doubt that the offense charged was committed by the defendant and others, pursuant to a plan or scheme, or that he advised or encouraged the offense, then such person is a principal in any such crime so committed, whether he was personally present or not."

To the giving of the above instruction the defendant, in the trial court, objected "on the grounds and for the reason that the whole theory of the case was that these two men were active participants. There was no conspiracy, or no evidence to show that Bubnash entered into a plan whereby Peters would actually commit the offense."

In Tanner v. Smith, 97 Mont. 229, at pp. 237, 238, 33 P.2d 547, 550, this court said:

"* * * The court did not assume to cover the whole case in this one instruction. It was only one of several. It is elementary that 'instructions must be viewed as a whole where error in giving and refusing certain of them is relied on for reversal of the judgment.' Scott v. Waggoner, 48 Mont. 536, 139 P. 454, L.R.A. 1916C, 491; Cannon v. Lewis, 18 Mont. 402, 45 P. 572.

"When the instructions are read as a whole, it is apparent

that defendant could not possibly have been prejudiced by anything contained therein.

"In conformity with the foregoing principle, the court instructed the jury as follows: 'You should consider these instructions as a whole. You have no right to consider any part or parts of them to the exclusion of other portions thereof.'

"The particular instruction under consideration, when read in conjunction with all the other instructions given by the court, fairly presented the case to the jury. This instruction cannot be said to contain comments on the evidence in the forbidden sense." See also Wyant v. Dunn, 140 Mont. 181, 368 P.2d 917.

In the instant case of Bubnash, the trial court gave the jury some fifty-one instructions.

The court's instruction No. 15 given without objection read:

"15. You are instructed that to support a conviction of two persons for burglary, it is not essential that the entry shall be by both. If you find from the evidence and in accordance with these instructions, beyond a reasonable doubt, that one of such persons in fact made an entry as that term is defined in these instructions, and that he was then and there aided and abetted in such entry by the other such person, both said persons having the requisite intent referred to in these instructions at the time of such entry, then both are guilty, and burglary may be committed by aiding and abetting another in entering."

The court's instruction No. 16 given over defendant's objection read:

"16. You are instructed that the words 'aid and abet' in law and as used in these instructions comprehend all assistance rendered by acts, or words of encouragement, or support or presence, actual or constructive, to render assistance should it become necessary."

The court's instruction No. 19 given over defendant's objection read:

"19. You are instructed that an accomplice is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of a crime, either by being present and joining in the criminal act, by aiding and abetting another in its commission, or, not being present, by advising and encouraging its commission, are principals in the crime thus committed and are equally guilty thereof."

The first paragraph of the court's instruction No. 31 given without objection read:

"31. You are instructed that you should consider these instructions all together and you have no right to consider any part or portion of them to the exclusion of other portions."

Clearly under the trial court's instructions and under the law, the court's instruction No. 17-A should be considered together with the court's instructions numbered 15, 16 and 19 and all the other instructions given.

We find no merit in defendant's sixth specification of error. In our opinion, the defendant Cecil Bubnash received a fair trial and the judgment of conviction given and entered in accordance with the jury's verdict is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES and JOHN C. HARRISON, concur.

MR. JUSTICE DOYLE, (concurring in part, dissenting in part).

I concur in the result of this case, but I most strongly dissent to that part of the opinion at page 393 wherein the following quotation appears.

"In 31 C.J.S. Evidence § 200, at p. 940, it is said that, 'it is considered that knowledge acquired in the line of official duty or employment is not objectionable as based on hearsay.' "

The reason actuating this partial dissent is the fact that the above quotation has absolutely nothing to do with criminal prosecution but on the contrary refers to officers or employees of corporations and businesses engaged in their usual tasks,

as to their practice and method concerning their several duties.

In criminal cases, the arresting or investigating officer will often explain his going to the scene of the crime or his interview of the defendant, or his search and seizure, by stating that he did so "upon information received" and this of course will not be objectionable as hearsay, but if he becomes more specific by *repeating definite complaints of a particular crime by the accused,* this is so likely to be misused by the jury as evidence of the fact asserted that it must be excluded as hearsay.

In Smith v. United States, (1939) 70 App. D.C. 255, 105 F.2d 778, the court there held an officer may testify before a jury that, acting upon information, he did certain things, but he may not go further and testify precisely what he was told about the particular place or the particular person.

In People v. Goltra, 115 Cal.App. 539, 2 P.2d 35, the court there held:

"[Officer] Kelly's testimony concerning his investigation which disclosed that the records of the Southern Pacific Railroad Company failed to show that Charles Gordon ever worked for such company on the Bakersfield division was hearsay and should not have been admitted."

In People v. Luce, 135 Cal.App. 1, 26 P.2d 501, the court said: "A revolver and a sweater which he had discarded were recovered and also were identified. During direct examination of the defendant by his counsel and in an effort to establish an alibi, objections by the people to offered testimony that he had been with a third party at the time of the commission of the offense and had heard him state that he had 'shot a man' were sustained. This was hearsay and the ruling was correct that evidence which does not tend to disprove established facts cannot avail the party offering it, and that 'evidence "which does not derive its force solely from the credit to be given to the witness himself, but rests, also, in part, on

the veracity and competency of some other person" * * *
is as self-evident as any truism,' is a familiar rule."

In Seigler v. State, 54 Okl.Cr. 141, 15 P.2d 1048, the court
held that:

"The rule is also well established in this state that a third
person may not testify to conversations had with a husband
or wife in the presence or absence of the other, concerning
an offense alleged to have been committed by the other. This
evidence is held to be incompetent upon two grounds: First,
that the husband or wife may not be a witness against the
other, except for an offense committed against the one testi-
fying; that, since the wife or husband is incompetent to tes-
tify against the other, the rule may not be evaded by permit-
ting a third person to testify to conversations or admissions
made by the husband or wife where the other is charged with
crime; second, because such evidence is hearsay."

In the case of State v. Martinez, 67 Ariz. 389, 198 P.2d 115,
the court there held:

"However we think that the court very properly refused
to admit in evidence the 'booking slips' from the police de-
partment. A mere reading of the comments on defendants'
exhibit No. 2 for identification, which is typical of the exhibits
offered, 'This woman was drunk on the street. She told Offi-
cer Norris that she had stayed with five men this afternoon.
She was in company with a known prostitute Josephine Bus-
tomonte,' shows its inadmissibility. It is the rankest kind of
hearsay, a mere informal memoranda of possible acts and not
proof of acts."

The quotation in the majority opinion wreaks no violence
upon the decision in this cause. However, the writer feels
compelled to alert prosecutors that a literal following of this
Corpus Juris Secundum quotation can lead to a reversal in the
field of criminal prosecution.